Diego J. Aranda Teixeira
AL OTRO LADO, INC.
634 S. Spring St. Suite 908
Los Angeles, CA 90014
Telephone: 253-882-8071
Email: diego@alotrolaodo.org

Pro Bono Attorney for Petitioner
HEVER ALBERTO MENDOZA LINARES

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEVER ALBERTO MENDOZA LINARES, AL OTRO LADO<br><br>　　Petitioner,<br><br>　v.<br><br>MERRICK GARLAND, United States Attorney General, ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; JAMES DOBSON, Otay Mesa Detention Center Officer in Charge, Immigration and Customs Enforcement; CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center,<br><br>　　Respondents. | CIVIL　　CASE　　NO.: 3:23-cv-01094-TWR-KSC<br><br>**AMENDED PETITION AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241** |

## INTRODUCTION

1.  Petitioner Hever Alberto Mendoza Linares ("Mr. Mendoza") previously brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Declaratory Judgment Act,  28 U.S.C. §§ 2201 and 2202, seeking injunctive and other appropriate relief to compel the United States Immigration and Customs Enforcement ("ICE") to act on his FOIA request. Petitioner now amends his complaint to add a petition for habeas corpus relief.

2.  Petitioner, Mr. Mendoza, has been unlawfully detained without a custody redetermination hearing in unreasonable conditions for over three years,  affecting his mental health and ability to pursue immigration relief. He thus respectfully petitions this Honorable Court for a writ of habeas corpus to remedy his unlawful detention by Respondents.

3.  Additionally, Mr. Mendoza seeks relief under FOIA. On March 30, 2023, Mr. Mendoza submitted a FOIA request to ICE through Undersigned Counsel who is a member of Al Otro Lado, seeking specific information related to Mr. Mendoza including all Record of Determination and Parole Determination Worksheets, Post Order Custody Review Worksheets, all other documents regarding parole determinations, custody redeterminations, and custody reviews, and all documents regarding segregation or solitary housing or disciplinary measures and medical determinations and medical treatment requested by Mr. Mendoza ("the Request").

4.  106 days have passed since Mr. Mendoza filed the request through Al Otro Lado and yet, to date, ICE has not issued a determination with regard to the Request. As a result, Defendant Respondents still have failed to produce even a single document in response to the Request aside from notifying Undersigned Counsel that that request would be rerouted to USCIS. As a result, Defendants still have failed to produce even a single document in response to the Request, and they have not communicated to AOL anything regarding the disposition of their Request aside from a statement of rerouting of the request. The statutorily-allowed time has elapsed without a disposition or production of the requested records.

5.  Mr. Mendoza, therefore files this Complaint seeking to compel ICE to issue a substantive determination with regard to the Request. The FOIA request involved in this case is ***critically urgent*** because Defendants' failure to adequately medically treat Mr. Linares Mendoza is ***still*** ongoing. Defendants' illegal practice threatens Mr. Linares Mendoza's life and safety and risks the development of more serious complications as a result of his illnesses.

## **PARTIES**

6.  Petitioner Hever Alberto Mendoza Linares, is a citizen of El Salvador who has been detained by Immigration and Customs Enforcement ("ICE") since approximately February 10, 2020. *See* Exh.A, "Mendoza Decl."

7.  Petitioner Plaintiff Al Otro Lado is a non-profit, non-partisan organization

based primarily in Los Angeles, California. Al Otro Lado is a legal services organization serving indigent deportees, migrants, refugees, and their families. Al Otro Lado's mission is to coordinate and to provide screening, advocacy, and legal representation for individuals in immigration proceedings and detained by DHS, to seek redress for civil rights violations, and to provide assistance with other legal and social service needs. Al Otro Lado regularly provides information and analysis to the media, the general public, and human rights monitoring bodies and disseminates information about its work and conditions on the U.S.-Mexico border and in immigration detention through its various social media accounts and website.[1] Disseminating information to the public is a critical component of Al Otro Lado's work. Al Otro Lado does this at no cost to the public.

8.  Respondent and Defendant Merrick Garland is the Attorney General of the United States Department of Justice.

9.  Respondent and Defendant Alejandro Mayorkas is the Secretary of the Department of Homeland Security ("DHS"), the Department that contains the agency, ICE, that continues to detain Mr. Mendoza against his will.

10. Respondent and Defendant ICE is a component agency of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). ICE is the agency that

---

[1] See Al Otro Lado, Twitter, https://twitter.com/AlOtroLado_Org; Al Otro Lado, Instagram, https://www.instagram.com/alotrolado_org; Al Otro Lado, Facebook, https://www.facebook.com/AlOtroLadoOrg/; Al Otro Lado, https://alotrolado.org/.

continues to detain Mr. Mendoza against his will and in intolerable conditions. ICE also has possession of and control over the records requested by AOL and Mr. Mendoza.

11. Respondent and Defendant Gregory J. Archambeault is the San Diego Field Office Director of ICE, a component agency of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). He therefore exercises control over the detention of Mr. Mendoza and the conditions of such detention.

12. Respondent and Defendant James Dobson is the Otay Mesa Detention Center Officer in Charge for ICE, a component agency of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). He therefore exercises control over the detention of Mr. Mendoza and the conditions of such detention.

13. Respondent and Defendant Christopher J. Larose is the Senior Warden of the Otay Mesa Detention Center, contracted by  ICE, a component agency of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). He therefore exercises control over the detention of Mr. Mendoza and the conditions of such detention.

14. Ur Jaddou is the Director of the United States Citizenship and Immigration Service ("USCIS"), a component agency of DHS and an "agency" within the meaning of 5 U.S.C. § 552(f)(1). USCIS is the agency said to have had Mr. Mendoza's FOIA request transferred to them.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B), 522(a)(6)(C)(i), as well as 28 U.S.C. §§ 1331, 2201(a), and 2202.

16. Venue is proper in this district under 5 U.S.C. § 552(a)(4)(B) because Plaintiff resides in and has its principal place of business here.

17. Pursuant to 5 U.S.C. § 552(a)(6)(C)(i), CBP and ICE have constructively denied Mr. Mendoza's and AOL's Requests because they have not issued determinations as to either request.

18. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §§ 2201, 2202 (declaratory relief) and the Fifth Amendment to the United States Constitution. Pursuant to 5 U.S.C. § 702, the United States waives sovereign immunity against actions for relief other than money damages. This Court may grant relief under the statutory and constitutional provisions set forth in the preceding paragraph as well as pursuant to Federal Rule of Civil Procedure 65 (injunctive relief).

19. Congress has preserved judicial review of challenges to prolonged immigration detention. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 841 (2018) (holding that 8 U.S.C. §§ 1226(e), 1252(b)(9) do not bar review of challenges to prolonged immigration detention); *see also id*. at *44 (Breyer, J., dissenting). In

*Dep't of Homeland Sec. v. Thuraissigiam*, an asylum seeker who had received an expedited removal order filed a habeas petition, challenging the government's process in reaching his negative credible-fear determination and seeking "a new opportunity to apply for asylum and other forms of applicable relief." 140 S. Ct. 1959, 1967-68 (2020). There, the Court held that Congress could bar that type of claim because the Suspension Clause does not apply to a habeas petition seeking "to obtain additional administrative review of [an] asylum claim and ultimately to obtain authorization to stay in this country." *Id*. at 1963. The Supreme Court explained that "the historic core of habeas" has consisted of "provid[ing] a means of contesting the lawfulness of restraint and securing release." *Id*. at 1969. Here, Mr. Mendoza's petition is precisely the type of habeas claim that falls within the writ's historic scope because he is specifically contesting the lawfulness of his physical confinement.

20. Petitioner is currently detained in the custody of Respondents at the Otay Mesa Detention Facility in San Diego, California. Venue lies in the United States District Court for the Southern District of California, the judicial district in which Petitioner is currently in custody. Venue is proper in the Southern District of California under 28 U.S.C. § 1391, as venue is proper in any district in which a defendant resides, and a substantial part of the events giving rise to Petitioner's claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

21. Petitioner need not exhaust administrative remedies because he asserts violations of his substantive due process rights under the Fifth Amendment. However, even if the Court were to consider exhaustion of administrative remedies a requirement, Petitioner has exhausted all timely, available, and meaningful administrative remedies to secure his release from detention.

22. Petitioner filed multiple parole requests with ICE asking for his immediate release from detention.

23. On June 1, 2020, Petitioner submitted a *Fraihat v. U.S. Immigration & Customs Enf't,* 445 F. Supp. 3d 709 (C.D. Cal. 2020) parole request with ICE due to his medical vulnerabilities. Mendoza Decl. ¶ 13. On June 9, 2020, ICE denied Petitioner's request stating that "the granting of such discretionary release would not conform to this agency's priority." Exh. B, Parole Denial dated June 9, 2020.

24. On February 18, 2021, Petitioner submitted a second parole request with ICE. Mendoza Decl. ¶ 28. On March 4, 2021, Petitioner's Deportation Officer called Petitioner's attorney stating Petitioner's parole request was denied because Mr. Mendoza was in expedited removal proceedings. *Id.* ICE did not provide Petitioner with a physical copy of their denial decision. *Id.*

25. On May 11, 2021, Petitioner submitted a Case Review Release Request with both his Deportation Officer and the San Diego ERO Field Office. *Id.* ¶ 40. On

May 14, 2021, ICE once again denied Petitioner's request and provided Petitioner with a document titled Notification Declining to Grant Parole. Exh. E, Parole Denial dated May 14, 2021.

26. Petitioner has been deemed ineligible for bond.

27. On January 15, 2021, Petitioner was scheduled for a bond hearing, but the Immigration Judge held that he had "no jurisdiction" to hear the bond hearing. Exhibit C, Immigration Judge Order Denying Bond.

28. On February 16, 2021, Mr. Mendoza, through counsel, filed a motion to reconsider the Immigration Judge's bond denial decision. Mendoza Decl. ¶ 26. The Immigration Judge denied Petitioner's motion to reconsider without considering Petitioner's arguments that cited pertinent authority. Exhibit D, Immigration Judge Order Denying Petitioner's Motion to Reconsider.

29. On May 11, 2021, Mr. Mendoza, through counsel, filed a parole request. Mendoza Decl. ¶ 40.

30. On May 14, 2021, Mr. Mendoza, through counsel, filed a bond appeal at the Board of Immigration Appeals. Mendoza Decl. ¶ 27.

31. On May 20, 2021, Mr. Mendoza learned that his parole request was denied. Mendoza Decl. ¶ 40.

32. Mr. Mendoza has therefore exhausted all agency avenues for release available to him.

33. In any event, exhaustion is inappropriate where, as here, Petitioner is asserting violations of his Fifth Amendment substantive due process rights. Because Mr. Mendoza asserts constitutional substantive due process claims that are beyond the jurisdiction of the immigration court and Board of Immigration Appeals ("BIA"), exhaustion is not required. *Garcia-Ramirez v. Gonzales*, 423 F.3d 935, 938 (9th Cir. 2005) ("Because the BIA does not have jurisdiction to resolve constitutional challenges, . . . due process claims—other than those alleging only 'procedural errors' within the BIA's power to redress—are exempt" from exhaustion.)

34. In sum, even if meaningful administrative remedies were promptly available, as a noncitizen bringing a constitutional due process challenge under 8 U.S.C. § 2241 to the lawfulness of her ongoing immigration detention, Petitioner is not required to exhaust them. *Chettiar v. Holder*, 665 F.3d 1375, 1379 n.2 (9th Cir. 2012). And as a general matter, "[o]n habeas review under § 2241, exhaustion is a prudential rather than jurisdictional requirement." *Singh v. Holder*, 638 F.3d 1196, 1203 n.3 (9th Cir. 2011).

## STATUTORY FRAMEWORK FOR FOIA

35. Any member of the public may request records from an agency of the United States under FOIA. An agency that receives a FOIA request must issue a determination in writing to the requester within 20 business days after receipt of

the request. 5 U.S.C. § 552(a)(6)(A)(i). In its determination, the agency must:

inform the AOL as to whether it intends to comply with the request; provide

reasons for its determination; and inform the requester of his or her right to appeal

the determination. *Id*. FOIA provides for an extension of this deadline "[i]n

unusual circumstances" but limits this extension to "ten working days." 5 U.S.C. §

552(a)(6)(B)(i).

36. A "determination" demands "more than mere acknowledging receipt of the

Request and stating the agency will produce any non-exempt records that it may

later locate." *Electronic Privacy Information Center v. Department of Justice*, 15

F.Supp.3d 32, 40 (D.D.C. 2014). Rather, "in order to make a 'determination' and

thereby trigger the administrative exhaustion requirement, the agency must at least:

(i) gather and review the documents; (ii) determine and communicate the scope of

the documents it intends to produce and withhold, and the reasons for withholding

any documents; and (iii) inform the requester that it can appeal whatever portion of

the 'determination' is adverse." *Citizens for Responsibility and Ethics in*

*Washington v. Federal Election Commission*, 711 F.3d 180, 188 (D.C. Cir. 2013)

("*CREW*").

37. DHS components must process FOIA requests on an expedited basis if the

requester meets any one of four criteria related to: (1) imminent threats to life and

physical human safety; (2) an urgency to inform the public about an actual federal

government activity; (3) the loss of substantial due process rights; or (4) a matter of widespread media interest in which there exists possible questions about the government's integrity which could affect public confidence. 6 C.F.R. § 5.5(e); 5 U.S.C. § 552(a)(6)(E). A component agency is required to notify the requester of its decision regarding expedited processing within ten days of receipt of the request for expedited processing. 6 C.F.R. § 5.5(e)(4).

38. A FOIA requester is deemed to have exhausted all administrative remedies if the agency fails to comply with the request within statutory time limits. 5 U.S.C. § 552(a)(6)(C)(i).

39. FOIA requires an agency to disclose in a timely manner, in response to a FOIA request, all records that do not fall within nine narrowly construed statutory exemptions. 5 U.S.C. § 552 (a)(3)(A); 5 U.S.C. § 552(b)(1)-(9). FOIA also requires an agency to make a reasonable search for responsive records. 5 U.S.C. § 552(a)(3)(C).

## **STATEMENT OF FACTS**

*Mr. Mendoza's Background and Immigration History*

40. Mr. Mendoza is a 35-year-old native and citizen of El Salvador who entered the United States to seek asylum on February 10, 2020. Immigration authorities detained him, questioned him, and eventually transferred him to the Otay Mesa Detention Center ("OMDC") on or around February 14, 2020.

41. Mr. Mendoza has been in ICE custody for 38 months. Over the past 38 months, while in a pandemic, Mr. Mendoza has been transferred on multiple occasions from OMDC, to Adelanto Detention Center, back to OMDC, to Florence Detention Center, to San Luis Regional Detention Center, and then back to OMDC.

42. Mr. Mendoza was referred to an asylum officer because he expressed fear due to threats made to his life in his home country and was issued a credible fear interview ("CFI") in March 2020. Mr. Mendoza did not understand some of the questions that he was asked during his CFI. An Asylum Officer ("AO") rendered a negative CFI determination. Mr. Mendoza sought review before an Immigration Judge who affirmed the negative CFI on May 27, 2020.

43. On June 8, 2020, Mr. Mendoza filed a *pro se* petition for review with the Ninth Circuit Court of Appeals and was issued a stay of removal with the assistance of a non-profit attorney named Shannon Johnson.

44. In June 2020, Mr. Mendoza was informed that he was going to be removed. Mr. Mendoza tried to inform officers that he had a stay of removal order and gave the officers a copy of the stay of removal the Ninth Circuit issued.

45. On June 9, 2020, Mr. Mendoza was transferred to Florence, Arizona. Within days, he was transferred again to the San Luis Regional Detention facility. In August 2020, he was transferred back to OMDC.

46. While detained in Arizona, Mr. Mendoza was assisted by a

non-profit legal organization called the Florence Project in requesting (1) a
reconsideration of his negative CFI with USCIS, or in the alternative, (2) a second
credible fear interview. Although USCIS denied Mr. Mendoza's request for a
reconsideration of his first CFI, they agreed to re-interview him. Mr. Mendoza's
*pro bono* counsel, Shannon Johnson, was present for this second CFI. Due to his
transfers, Mr. Mendoza was unable to maintain consistent contact with his then
attorney and now fears that his results were lost in the midst of all the abrupt
movement he was subjected to.

47. While in ICE custody, Mr. Mendoza has repeatedly requested and
been denied appropriate medical care. Mr. Mendoza suffers from adjustment
disorder with mixed anxiety and depressed mood, testicular pain, a potential tumor
or blood clot, and respiratory issues due to lung damage. Mr. Mendoza took
medicine for his medical conditions relating to his lung damage while in El
Salvador but has not had access to those medications in detention. When Mr.
Mendoza has sought medical attention in ICE custody, he is seen by a nurse, not a
doctor, and usually only given Tylenol.

48. On or around October 28, 2020, Mr. Mendoza had a physical exam
and was told that he may have a tumor or blood clot. Mr. Mendoza did not see a
urologist until April 26, 2021. On that date, Mr. Mendoza was brought to a hospital
in San Diego for injuries he suffered after being the victim of a beating while

detained at the San Luis Detention Facility.

49. Mr. Mendoza has also been quarantined multiple times due to
facility transfers, unsafe protocols during the COVID-19 pandemic, and retaliatory
measures, in several instances beyond the standard 14 days. While at OMDC, Mr.
Mendoza has been in pods in which he was exposed to COVID-19. While he was
in M pod, someone in the same pod died from COVID-19. Mr. Mendoza remains
fearful of becoming with COVID-19 or another disease while detained.

50. While in ICE custody, Mr. Mendoza has been the victim of five
instances of physical assault.

51. In March 2020, Mr. Mendoza was punched in the face by another detainee.
Officers did not even notice this incident. It was not until Mr. Mendoza reported it
and officers reviewed video footage that they took notice.

52. On July 4, 2020, Mr. Mendoza was punched in the face, neck, and back by
another detainee at the San Luis Regional Detention Center. This occurred after the
detainee inappropriately touched and sexually harassed Mr. Mendoza which
triggered past memories of abuse. Mr. Mendoza was placed in solitary confinement
after the incident.. Mr. Mendoza pressed charges, but his declaration of the incident
was not taken for over a week after its occurrence.

53. On or around October 6, 2020, while at OMDC, Mr. Mendoza was kicked in

the rib area by another detainee. The detainee then proceeded to grab a chair and hit Mr. Mendoza causing injuries to his head. Mr. Mendoza filed a police report with the San Diego Police Department. Mr. Mendoza's injuries were so severe that he was placed in a wheelchair for approximately 17 days.

54. On April 13, 2021, Mr. Mendoza was again physically assaulted, for the fourth time, by another detainee at OMDC. CoreCivic staff segregated Mr. Mendoza and placed him in solitary confinement until April 23, 2021. After being back in his pod for 5 days on April 29, 2021 officers came and again placed him in solitary. While being escorted out of the pod and restrained, he was being filmed by the officer, further making Mr. Mendoza feel humiliated and punished despite being a victim.

55. Mr. Mendoza's time in solitary has been mentally torturous for him. He has experienced severe depression and thoughts of hurting himself. He was completely alone during his time in solitary confinement and had little to no contact with anyone. His two hours of yard time each day were consistently cut short. Mr. Mendoza was offered yard time early in the morning, when it was coldest. While he was in the yard or the recreational "rec" room watching tv, he was kept in a small cage. Solitary confinement also exacerbated Mr. Mendoza's health issues, as the stress of being in solitary made it more difficult for him to breathe normally.

56. On May 29, 2021, Mr. Mendoza went on a hunger strike for about nine days in hopes of being released from solitary confinement. ICE officers tried to make a deal with Mr. Mendoza to get him to eat, including offering more recreational time and outside food, but Mr. Mendoza refused because he only wanted to be taken out of solitary. Finally, Mr. Mendoza was told that if he agreed to eat, there was a 95 percent chance that he could be moved to his old pod. Mr. Mendoza finally agreed to end his hunger strike because he believed it was the better alternative he had at the moment.

57. In December 2022, Mr. Mendoza began getting persistent migraines that he believes are caused by his excessive coughing which is caused by his acid reflux inflammation. His current treatment is taking five Tylenol pills every night for migraines.

58. In March 2023, Mr. Mendoza went to the medical center at Otay. He was denied access to see a doctor or nurse. He was told this was because he had an upcoming hospital appointment, but they would not tell him when his appointment is due to "safety concerns."

59. Mr. Mendoza struggles to eat the food at Otay because it causes him acid reflux and pain. He has lost weight and although a doctor told him that he could try a liquid diet to help, she later told him that he would not get one.

60. Mr. Mendoza suffers frequent nightmares of being shot. He is mentally

unwell but is afraid of speaking to the psychologist for fear of being put back into isolation.

61. Mr. Mendoza is currently on hunger strike, again.

62. Mr. Mendoza has never shown himself to be a danger or a flight risk and this extremely prolonged detention is therefore unjustified. He has never had the opportunity to have a bond hearing to challenge the legality of his detention.

*Parole and Custody Redetermination Requests*

63. Petitioner filed multiple parole requests with ICE asking for his immediate release from detention.

64. On June 1, 2020, Petitioner submitted a *Fraihat v. U.S. Immigration & Customs Enf't,* 445 F. Supp. 3d 709 (C.D. Cal. 2020) parole request with ICE due to his medical vulnerabilities. Mendoza Decl. ¶ 13. On June 9, 2020, ICE denied Petitioner's request stating that "the granting of such discretionary release would not conform to this agency's priority." Exhibit B, Parole Denial dated June 9, 2020.

65. On February 18, 2021, Petitioner submitted a second parole request with ICE. Mendoza Decl. ¶ 28. On March 4, 2021, Petitioner's Deportation Officer called Petitioner's attorney stating Petitioner's parole request was denied because Mr. Mendoza was in expedited removal proceedings. *Id.* ICE did not provide Petitioner with a physical copy of their denial decision. *Id.*

66. On May 11, 2021, Petitioner submitted a Case Review Release Request with

both his Deportation Officer and the San Diego ERO Field Office. *Id.* ¶ 40. On May 14, 2021, ICE once again denied Petitioner's request and provided Petitioner with a document titled Notification Declining to Grant Parole. Exhibit E, Parole Denial dated May 14, 2021.

67. Petitioner has been deemed ineligible for bond.

68. On January 15, 2021, Petitioner was scheduled for bond hearing, but the Immigration Judge held that he had "no jurisdiction" to hear the bond hearing. Exhibit C, Immigration Judge Order Denying Bond.

69. On February 16, 2021, Mr. Mendoza, through counsel, filed a motion to reconsider the Immigration Judge's bond denial decision. Mendoza Decl. ¶ 26. The Immigration Judge denied Petitioner's motion to reconsider without considering Petitioner's arguments that cited pertinent authority. Exhibit D, Immigration Judge Order Denying Petitioner's Motion to Reconsider.

70. On May 11, 2021, Mr. Mendoza, through counsel, filed a parole request. Mendoza Decl. ¶ 40.

71. On May 14, 2021, Mr. Mendoza, through counsel, filed a bond appeal at the Board of Immigration Appeals. Mendoza Decl. ¶ 27.

72. On May 20, 2021, Mr. Mendoza learned that his parole request was denied. Mendoza Decl. ¶ 40.

*The FOIA Request*

73. On March 31, 2023, AOL submitted a FOIA request to ICE, seeking Defendants' records related to Mr. Mendoza Linares' time in their custody.

74. Specifically, AOL sought the following records:

1. All Record of Determination/Parole Determination Worksheets

2. All Post Order Custody Review Worksheets

3. All other documents regarding parole determinations, custody redeterminations, and custody reviews, and

4. All documents regarding segregation or solitary housing or disciplinary measures inflicted on or medical determinations or medical treatment requested by or required by

For Hever Alberto Mendoza Linares, A#213-209-821.

75. AOL also sought expedited processing of its Request and provided detailed explanations of why the Request satisfies all four of DHS's requirements for expedited processing: (1) circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to life and physical human safety; (2) an urgency to inform the public about an actual federal government activity; (3) the loss of substantial due process rights (namely access to the asylum process as described above); and (4) a matter of widespread media interest in which there exists possible questions about the government's integrity which could affect public confidence. 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. §

5.5(e).

76. AOL's and Mr. Mendoza's Request explained that any delay of disclosing the requested documents "could reasonably be expected to pose an imminent threat to the life or physical safety of an individual." 6 C.F.R. § 5.5(e)(1)(i). The Request explained that Mr. Mendoza Linares' ongoing mental and physical health is currently endangered by his ongoing detention and the conditions that he is currently facing in detention.

77. Second, AOL's Request explained that any delay of disclosing the requested information could lead "[t]o the loss of substantial due process rights." 6 C.F.R. § 5.5(e)(1)(iii). The Request explained that Mr. Mendoza Linares cannot seek recourse for any issues regarding his custody reviews, parole determinations, or detention conditions if he is eventually removed without these records.

78. Third, the Request explained it sought record on "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). The Request explained that immigration detention and conditions in immigration detention are the cause of sustained media interest and raise questions about the government's integrity, which affect public confidence.

79. By email, ICE responded that same day:

> You have directed a FOIA request to U.S. Immigration and Customs Enforcement (ICE) seeking either (1) copies of your

> entire immigration file also known as an alien file or A-file (ICE, CBP, OBIM, USCIS records), or (2) copies of certain documents or other information that is maintained in an individual's immigration file. Complete immigration files are maintained by U.S. Citizenship and Immigration Services (USCIS). Accordingly, ICE is routing your FOIA request to USCIS. Upon receipt of your FOIA request, USCIS will provide you with a tracking number and respond directly to your request.

80. Undersigned Counsel responded, asking ICE to "confirm that the A file held by USCIS will include all information regarding detention decisions and conditions pertaining to my client."

81. ICE confirmed: "All immigration records are kept in the A-file. ICE does not retain copies of immigration documents. For example, if ICE issued a specific document to your client, a copy of that document is in the A-file."

82. ICE's response is factually incorrect and misleading.

83. As the name "Immigrations and Customs Enforcement" implies, Congress annually provides ICE with millions of taxpayer dollars so that it can enforce customs and immigration.

84. Enforcing immigration and customs requires ICE to create and retain copies of immigration records.

85. ICE retains copies of immigration records.

86. ICE retains copies of Mr. Mendoza's immigration records.

87. FOIA requires ICE to make a valid FOIA determination after receiving a FOIA request.

88. Denying possession of records in an agency's possession is not a valid determination. *See CREW*, 711 F.3d at 188.

89. USCIS never provided the tracking number as ICE had promised in its March 31, 2023 email.

90. On information and belief, ICE never referred Plaintiff's request to USCIS.

91. On April 4, 2023, ICE sent Undersigned Counsel an additional communication, this time attempting to administratively close the already denied and referred Mar 31, 2023 request. ICE based this attempted closure on Undersigned Counsel's supposed failure to abide by 6 C.F.R. § 5.21(f), a regulation governing requests by the guardians of minor children or disabled people.

92. ICE cannot administratively close a FOIA request it both denied and referred to USCIS.

93. Nor could Undersigned Counsel comply with 6 C.F.R. § 5.21(f): Mr. Mendoza is not a minor child or a disabled person and Undersigned Counsel is not his legal guardian.

94. ICE has not issued a valid determination with regard to the Request.

95. USCIS has not issued a valid determination with regard to the Request.

96. Defendant Respondents still have failed to produce even a single document in response to the Request.

97. Defendant Respondents have not made a timely expedited processing determination.

*Habeas Argument*

98. "'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings.'" *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty" that the Due Process Clause protects. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *see also id*. at 718 (Kennedy, J., dissenting) ("Liberty under the Due Process Clause includes protection against unlawful or arbitrary personal restraint or detention."). This fundamental due process protection applies to all noncitizens, including both removable and inadmissible noncitizens. *See id*. at 721 (Kennedy, J., dissenting) ("[B]oth removable and inadmissible aliens are entitled to be free from detention that is arbitrary or capricious.").

99. Due process therefore requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement "outweighs the individual's constitutionally protected interest in avoiding physical restraint."

*Id.* at 690 (internal quotation marks omitted). In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention—to mitigate the risks of danger to the community and to prevent flight. *Id.*; *Demore*, 538 U.S. at 528.

100.    Due process requires that the government provide bond hearings to noncitizens facing prolonged detention. "The Due Process Clause foresees eligibility for bail as part of due process" because "[b]ail is basic to our system of law." *Id.* at *28 (Breyer, J., dissenting) (internal quotations and citations omitted). While the Supreme Court upheld the mandatory detention of a noncitizen under Section 1226(c) in *Demore*, it did so based on the petitioner's concession of deportability and the Court's understanding that detentions under Section 1226(c) are typically "brief." *Demore*, 538 U.S. at 528 n.6. Where a noncitizen has been detained for a prolonged period or is pursuing a substantial defense to removal or claim to relief, due process requires an individualized determination that such a significant deprivation of liberty is warranted. *Id.* at 532 (Kennedy, J., concurring) ("individualized determination as to his risk of flight and dangerousness" may be warranted "if the continued detention became unreasonable or unjustified"); *see also Jackson v. Indiana*, 406 U.S. 715, 733 (1972) (detention beyond the "initial commitment" requires additional safeguards); *McNeil v. Dir.*, Patuxent Inst., 407 U.S. 245, 249-50 (1972) ("lesser safeguards may be appropriate" for "short-term

confinement"); *Hutto v. Finney*, 437 U.S. 678, 685-86 (1978) (in Eighth

Amendment context, "the length of confinement cannot be ignored in deciding

whether [a] confinement meets constitutional standards").

101.   Following *Zadvydas* and *Demore*, every circuit court of appeals to
       confront

the issue has found either the immigration statutes or due process require a hearing

for noncitizens subject to unreasonably prolonged detention pending removal

proceedings. *See Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199 (11th Cir. 2016)

(detention under 8 U.S.C. § 1226(c)); *Reid v. Donelan*, 819 F.3d 486 (1st Cir. 2016)

(same); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) (same); *Casas-Castrillon v.*

*Dep't of Homeland Security*, 535 F.3d 942 (9th Cir. 2008) (same); *Diop v.*

*ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011) (same); *Diouf v. Holder (Diouf*

*II)*, 634 F.3d 1081 (same, under 8 U.S.C. § 1231(a)); *Ly v. Hansen*, 351 F.3d 263

(6th Cir. 2003) (requiring release under 8 U.S.C. § 1226(c) when mandatory

detention exceeds a reasonable period of time).

102.   In *Jennings v. Rodriguez*, the Supreme Court held that the Ninth Circuit

erred by interpreting Sections 1226(c) and 1225(b) to require bond hearings as a

matter of statutory construction. 138 S. Ct. 830, 846 (2018).

103.   Post-*Jennings* law is "quite unsettled" because the *Jennings* Court only
       held

that periodic bond hearings were not a statutory requirement, but "expressly avoided constitutional questions." *Yagao v. Figueroa*, 2019 WL 1429582, at *2 (S.D. Cal. Mar. 29, 2019); *Jennings* 138 S. Ct. at 851. However, "[n]early all district courts that have considered the issue agree that prolonged mandatory detention pending removal proceedings, without a bond hearing, will—at some point—violate the right to due process." *Banda v. McAleenan*, 385 F. Supp. 3d 1099, 1116 (W.D. Wash. 2019) (internal quotation marks omitted) (collecting cases).

104.   In *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022), the Ninth Circuit applied the test established in *Mathews v. Eldridge*, 424 U.S. 319 (1976) to a due process challenge to a noncitizen's detention under Section 1226(a). *Id.* at 1207. Other courts in this circuit have also applied the *Mathews* test in the context of prolonged detention. *See Singh v. Nielsen*, No. 18-CV-02490-LB, 2018 WL 4110549, at *3 (N.D. Cal. Aug. 29, 2018) (applying balancing test in *Mathews* to noncitizen detained under § 1225(b)); *Galdillo v. U.S. Dep't of Homeland Sec.*, No. EDCV21724JGBKKX, 2021 WL 4839502, at *3-4.

105.   *Mathews* established a three factor test to determine whether due process has

been met. First, the private interest that will be affected; second, the risk of an erroneous deprivation and the probable value of additional or substitute procedural

safeguards; and third, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews,* 424 U.S. at 334-35.

106.   When considering the private interest at stake, the Court should take into account whether detention is "prolonged." *See Rodriguez Diaz*, 53 F.4th at 1207 (*citing Diouf v. Napolitano* ("*Diouf II*"), 634 F.3d 1081, 1091 (9th Cir. 2011) (holding that once the noncitizen has been detained for six months, "continuing detention becomes prolonged"); *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001) (recognizing six months as a presumptively constitutional removal period); *see also Galdillo*, 2021 WL 4839502 at *3 (finding first factor weighed heavily in the petitioner's favor where he had been detained for over two (2) years and it had been over eighteen (18) months since his only bond hearing)).

107.   In *Rodriguez Diaz*, the Ninth Circuit noted that the presumptive six-month time limit was previously applied in the context of detentions where no individualized bond hearings had occurred at all. 53 F.4th at 1207. In that case, the petitioner had received a bond hearing two months after he was detained under Section 1226(a) and had later sought and had a renewed bond hearing available to him based on changed circumstances. *Id*. The Ninth Circuit also noted that the

petitioner's length of detention was due to the fact that he chose to challenge the IJ's denial of immigration relief before the BIA and the Ninth Circuit. *Id*.

108.   The Ninth Circuit acknowledged in *Rodriguez Diaz* that detainees under Section 1226(c) are generally afforded a lack of process as compared to Section 1226(a) detainees. *Rodriguez Diaz*, 53 F.4th at 1202. This reasoning extends to noncitizens detained under Section 1225 as well. Whereas Rodriguez Diaz, under Section 1226(a), was able to and did in fact seek reconsideration of this bond hearing based on changed circumstances, this option is not available to noncitizens detained under Section 1225(b).

109.   The government interest at stake "is not the continued detention of Petitioner, but the government's ability to detain him without a bond hearing." *Galdillo*, 2021 WL 4839502 at *3 (citing *Zagal-Alcaraz v. ICE Field Off.*, No. 3:19-CV-01358-SB, 2020 WL 1862254, at *7 (D. Or. Mar. 25, 2020) (collecting cases) *report and recommendation adopted sub nom. Zagal-Alcaraz v. ICE Field Off. Dir.*, No. 3:19-CV-01358-SB, 2020 WL 1855189 (D. Or. Apr. 13, 2020)).

110.   Whereas additional bond hearings may be more burdensome on the government in cases where noncitizens are detained under Section 1226(a) because they are afforded more process and the opportunity to appeal for a renewed custody determination based on changed circumstances, that is not the case for noncitizens detained under Section 1225.

111.   There is a high risk of erroneous deprivation because Section 1225(b)

provides no opportunity for any further bond determinations for the duration of

Petitioner's detention. In *Rodriguez Diaz*, the Ninth Circuit noted that the agency's

decision to detain the petitioner was "subject to numerous levels of review, each

offering Rodriguez Diaz the opportunity to be heard by a neutral decisionmaker."

*Rodriguez Diaz*, 53 F.4th at 1210. The facts here are in stark contrast. Since his

first and only bond hearing over thirty-six months ago, Petitioner has had no

available process to challenge his continued detention before a neutral

decisionmaker. Going forward, there is no available process for Petitioner to have a

neutral decisionmaker to consider his continued detention. Given that 1) Petitioner

has been held without a bond hearing for three years; 2) there is no opportunity for

a bond redetermination in sight; 3) it is not clear when Petitioner's petition for

review will be resolved; and 4) Petitioner has shown that his circumstances have

materially changed in the last thirty-six months, the risk of erroneous deprivation

weighs in favor of another bond hearing.

112.   Other district courts have applied a multi-factor "reasonableness" test

post-*Jennings* to determine whether a specific detention has become unreasonable

absent a bond hearing. *See Banda*, 385 F. Supp 3d at 1106-07.

113.   Many district courts have engaged in a case-specific analysis to

determine

the overall reasonableness of a prolonged detention, with factors "derived from *Zadvydas*, *Demore*, and the First, Third, Sixth, and Eleventh Circuits' pre-*Jennings* decisions regarding the reasonableness of prolonged detention under § 1226(c). *Banda*, 385 F. Supp. 3d at 1106 (holding that the magistrate judge was correct by using this test to noncitizen detained under to 8 U.S.C. § 1225(b)). These factors include 1) The total length of detention to date; 2) The likely duration of future detention; 3) The conditions of detention; 4) Delays in the removal proceedings caused by the detainee; 5) Delays in the removal proceedings caused by the government; and 6) The likelihood that the removal proceedings will result in a final order of removal." 385 F. Supp. 3d at 1106

114.    The length of detention is the most important factor. *See id*. at 1118; *Pasillas*, 2021 WL 8084206, at *7; *Banda* at 1118-19 (length of detention favored granting a bond hearing where noncitizen detained for 18 months under 8 U.S.C. § 1225(b)(1) without a bond hearing); *Rodriguez Diaz* 53 F.4th at 1207 (petitioner's 14 month detention qualified as prolonged); *Pasillas*, 2021 WL 8084206 at *4-5 (length of detention favored granting a bond hearing where he had been detained for over one year); *Lopez*, 2022 WL 4586413, at *7 (length of detention favored granting a bond hearing where he had been detained for over one year). Given that it has been nearly three years since Petitioner's previous bond hearing, this factor weighs in favor of Petitioner.

115.    Many courts have held the likely duration of future detention to weigh in favor of the petitioner where they are in the process of challenging their detention. *See, e.g. Banda*, 385 F. Supp 3d at 1119; *Pasillas*, 2021 WL 8084206 at *5; *Lopez*, 2022 WL 4586413, at *7-8. When a petitioner's length of future detention is uncertain and it is clear that the petitioner is not likely to be deported in the near future, this factor also weighs in favor of Petitioner.

116.    Otay Mesa Detention Center's conditions of detention have been documented as not living up to basic standards of decency and failed to implement reasonable safety measures during the COVID-19 pandemic.

117.    A petitioner's cause in delaying removal proceedings does not always negatively impact the petitioner. As the Ninth Circuit noted in *Singh*, noncitizens should not be forced to choose between "remaining in detention, potentially for years, or leaving the country and abandoning their challenges to removability even though they may have been improperly deemed removable." *Singh*, 638 F.3d at 1204.

118.    Petitioner's petition for review was nonfrivolous and he is now seeking review before the Supreme Court of the United States. He has a *pro bono* attorney for that petition for certiorari, and neither this Court nor these particular proceedings are the appropriate venue to determine the strength of Petitioner's arguments challenging his removal. Therefore, this factor is neutral.

119.   Consistent with this view, the federal courts have made clear that prolonged detention pending removal proceedings without a bond hearing likely violates due process. *See supra; Jennings*, 138 S. Ct. 830, 869 (Breyer, J, dissenting) ("[A]n interpretation of the statute before us that would deny bail proceedings where detention is prolonged would likely mean that the statute violates the Constitution."). In addition, numerous circuit and district courts have expressly found that the Constitution requires bond hearings in cases of prolonged detention. *See, e.g., Diop*, 656 F.3d at 233; *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 544-50 (S.D.N.Y. 2014); *Monestime v. Reilly*, 704 F. Supp. 2d 453, 458-59 (S.D.N.Y. 2010).

120.   Detention without a bond hearing is unconstitutional when it is prolonged, and precedent supports that such detention is prolonged at very least when it exceeds six months, if not before then. *See Demore*, 538 U.S. at 529-30 (upholding only "brief" detentions under Section 1226(c), which last "roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal"); *Zadvydas*, 533 U.S. at 701 ("Congress previously doubted the constitutionality of detention for more than six months").

121.   The recognition that six months is a substantial period of

confinement—and is the time after which additional process is required to support continued incarceration—is deeply rooted in our legal tradition. With few exceptions, "in the late 18th century in America crimes triable without a jury were for the most part punishable by no more than a six-month prison term." *Duncan v. State of La.*, 391 U.S. 145, 161 & n.34 (1968). Consistent with this tradition, the Supreme Court has found six months to be the limit of confinement for a criminal offense that a federal court may impose without the protection afforded by jury trial. *Cheff v. Schnackenberg*, 384 U.S. 373, 380 (1966) (plurality opinion). The Court has also looked to six months as a benchmark in other contexts involving civil detention. *See McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 249, 250-52 (1972) (recognizing six months as an outer limit for confinement without individualized inquiry for civil commitment). The Court has likewise recognized the need for bright line constitutional rules in other areas of law. See *Maryland v. Shatzer*, 559 U.S. 98, 110 (2010) (14 days for re-interrogation following invocation of Miranda rights); *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 55-56 (1991) (48 hours for probable cause hearing). Even if a bond hearing was not required after six months in every case, at a minimum, due process requires a bond hearing after detention has become unreasonably prolonged, as in the present case. *See Diop*, 656 F.3d at 234.

122.   At a bond hearing, due process requires certain minimal protections to

ensure that a noncitizen's detention is warranted: the government must bear the burden of proof by clear and convincing evidence to justify continued detention, taking into consideration available alternatives to detention; and if the government cannot meet its burden, the noncitizen's ability to pay a bond must be considered in determining the appropriate conditions of release.

123.   To justify prolonged immigration detention, the government must bear the burden of proof by clear and convincing evidence that the noncitizen is a danger or flight risk. *See Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011). Where the Supreme Court has permitted civil detention in other contexts, it has relied on the fact that the Government bore the burden of proof at least by clear and convincing evidence. *See United States v. Salerno*, 481 U.S. 739, 750, 752 (1987) (upholding pre-trial detention where "full-blown adversary hearing," requiring "clear and convincing evidence" and "neutral decision maker"); *Foucha v. Louisiana*, 504 U.S. 71, 81-83 (1992) (striking down civil detention scheme that placed burden on the detainee); *Zadvydas*, 533 U.S. at 692 (finding post-final-order custody review procedures deficient because, inter alia, they placed burden on detainee).

124.   Notably, "[noncitizens] should [not] be punished for pursuing avenues of relief and appeals." *Sopo*, 825 F.3d at 1218 (citing *Ly*, 351 F.3d at 272). Thus, courts should not count a continuance against the noncitizen when he obtained it in

good faith to prepare his removal case. Instead, only "[e]vidence that the alien
acted in bad faith or sought to deliberately slow the proceedings"—for example, by
"[seeking] repeated or unnecessary continuances, or [filing] frivolous claims and
appeals"—"cuts against" providing a bond hearing. *Id*.; *see also Chavez–Alvarez*,
783 F.3d at 476; *Ly*, 351 F.3d at 272.

125.   The requirement that the government bear the burden of proof by clear
and convincing evidence is also supported by application of the three-factor
balancing test from *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). First,
prolonged incarceration deprives noncitizens of a "profound" liberty interest. *See
Diouf II*, 634 F.3d at 1091–92. Second, the risk of error is great where the
government is represented by trained attorneys and detained noncitizens are often
unrepresented and frequently lack English proficiency. *See Santosky v. Krame*r,
455 U.S. 745, 763 (1982) (requiring clear and convincing evidence at parental
termination proceedings because "numerous factors combine to magnify the risk of
erroneous fact finding" including that "parents subject to termination proceedings
are often poor, uneducated, or members of minority groups" and "[t]he State's
attorney usually will be expert on the issues contested"). Moreover, detainees are
incarcerated in prison-like conditions that severely hamper their ability to obtain
legal assistance, gather evidence, and prepare for a bond hearing. *See* infra ¶ 39.
Third, placing the burden on the government imposes minimal cost or

inconvenience, as the government has access to the noncitizen's immigration records and other information that it can use to make its case for continued detention.

126.    Due process also requires consideration of alternatives to detention. The primary purpose of immigration detention is to ensure a noncitizen's appearance during removal proceedings. *Zadvydas*, 533 U.S. at 697. Detention is not reasonably related to this purpose if there are alternative conditions of release that could mitigate risk of flight. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979). ICE's alternatives to detention program—the Intensive Supervision Appearance Program—has achieved extraordinary success in ensuring appearance at removal proceedings, reaching compliance rates close to 100 percent. *Hernandez v. Session*s, 872 F.3d 976, 991 (9th Cir. 2017) (observing that ISAP "resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings"). It follows that alternatives to detention must be considered in determining whether prolonged incarceration is warranted.

127.    Due process likewise requires consideration of a noncitizen's ability to pay a bond. "Detention of an indigent 'for inability to post money bail' is impermissible if the individual's appearance at trial could reasonably be assured by one of the alternate forms of release.'" *Id*. at 990 (quoting *Pugh v. Rainwater*, 572 F.2d 1053, 1058 (5th Cir. 1978) (en banc)). It follows that—in determining the

appropriate conditions of release for immigration detainees—due process requires "consideration of financial circumstances and alternative conditions of release" to prevent detention based on poverty. *Id*.

128.    Evidence about immigration detention and the adjudication of removal cases provide further support for the due process right to a bond hearing in cases of prolonged detention.

129.    Each year, thousands of noncitizens are incarcerated for lengthy periods pending the resolution of their removal proceedings. *See Jennings v. Rodriguez,* 138 S. Ct. 830, 860 (2018*) (Breyer, J., dissenting). Among a class of immigration detainees in the Central District of California held for at least six months ("*Rodriguez* class"), the average length of detention was over a year, with many people held far longer. In numerous cases, noncitizens are incarcerated for years before winning their immigration cases. *Id*. (identifying cases of noncitizens detained for 813, 608, and 561 days before winning their cases). For noncitizens who have some criminal history, their immigration detention often dwarfs the time spent in criminal custody, if any. *Id*. ("[B]etween one-half and two-thirds of the class served sentences less than six months.").

130.    Noncitizens are detained for lengthy periods because they pursue meritorious claims. Among the *Rodriguez* class, 40 percent of noncitizens subject to Section 1226(c) won their cases, and two-thirds of asylum seekers subject to

Section 1225 won asylum. *See id*. Detained noncitizens are able to succeed at these dramatically high rates despite the challenges of litigating in detention, particularly for the majority of detainees who lack counsel. *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 36 (2015) (reporting government data showing that 86% of immigration detainees lack counsel).

131.    Immigration detainees face severe hardships while incarcerated. Immigration detainees are held in lock-down facilities, with limited freedom of movement and access to their families: "the circumstances of their detention are similar, so far as we can tell, to  those in many prisons and jails." *Jennings*, 138 S. Ct. 830 at *860 (Breyer, J., dissenting); *accord Chavez– Alvarez*, 783 F.3d at 478; *Ngo v. INS*, 192 F.3d 390, 397-98 (3d Cir. 1999); *Sopo*, 825 F.3d at 1218, 1221. "And in some cases the conditions of their confinement are inappropriately poor." *Jennings*, 138 S. Ct. 830 at *861 (Breyer, J., dissenting) (citing Dept. of Homeland Security (DHS), Office of Inspector General (OIG), DHS OIG Inspection Cites Concerns With Detainee Treatment and Care at ICE Detention Facilities (2017) (reporting in-stances of invasive procedures, substandard care, and mistreatment, e.g., indiscriminate strip searches, long waits for medical care and hygiene products, and, in the case of one detainee, a multi-day lock down for sharing a cup of coffee with another detainee)).

**COUNT ONE**
**Violation of FOIA, 5 U.S.C. § 552**
**for Failure to Issue Timely Determinations**

132.   Petitioner Plaintiffs reallege and incorporate by reference all the foregoing paragraphs in this Petition and Complaint as though fully set forth herein.

133.   AOL properly requested records within the possession, custody, and control of ICE.

134.   ICE violated FOIA, 5 U.S.C. § 552(a)(6)(A) by failing to issue timely determinations in response to AOL's Request. ICE is obligated under 5 U.S.C. § 552(a)(6)(A)(i) to make a determination regarding the Request within 20 business days or 30 business days if an extension is invoked.

135.   ICE has not issued any determination as to Petitioner Plaintiffs' request though it has remained pending for over twenty days.

136.   ICE has also failed to issue a determination regarding the request for expedited processing.

137.   When an agency fails to make a determination within the statutory deadline, requesters are entitled to "immediate judicial supervision" of their requests. *Daily Caller v. U.S. Dep't of State*, 152 F. Supp. 3d 1, 10 (D.D.C. 2015). "[T]he district court's supervision will aim to ensure that the agency is processing a request with 'due diligence' *and* as quickly 'as practicable.'" *Protect Democracy*

*Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293, 302 (D.D.C. 2017) (quoting

5 U.S.C. § 552(a)(6)(E)(iii)). Accordingly, AOL is entitled to judicial review in

this case.

## COUNT TWO
### Violation of FOIA, 5 U.S.C. § 552
### for Failure to Grant Expedited Processing

138.   Petitioner Plaintiffs reallege and incorporate by reference all the

foregoing paragraphs in this Petition and Complaint as though fully set forth

herein.

139.   FOIA requires agencies to provide for expedited processing of requests

fo records in cases in which the requester demonstrates a compelling need and in

other cases determined by the agency. 5 U.S.C. § 552(a)(6)(E). Upon receiving a

request for expedited processing, an agency must provide a determination of

whether the request for expedited processing will be granted within ten calendar

days after the date of the request. 5 U.S.C. § 552(a)(6)(E)(ii)(I).

140.   By failing to timely respond to Plaintiff's request for expedited

processing, ICE has violated FOIA.

## COUNT THREE
### Violation of FOIA, 5 U.S.C. § 552
### for Failure to Conduct an Adequate Search for Responsive Records

141.   Petitioner Plaintiffs reallege and incorporate by reference all the

foregoing paragraphs in this Petition and Complaint as though fully set forth

herein.

142.   ICE is an agency subject to FOIA and therefore must make reasonable efforts to search for requested records and to promptly make the requested records available. 5 U.S.C. § 552(a)(3)(C).

143.   Respondent Defendants' failure to conduct an adequate search for responsive records violates FOIA.

**COUNT FOUR**
**Violation of FOIA, 5 U.S.C. § 552**
**for Improper Withholding of Non-Exempt Responsive Records**

144.   Petitioner Plaintiffs reallege and incorporate by reference all the foregoing paragraphs in this Petition and Complaint as though fully set forth herein.

145.   Petitioner Plaintiffs properly requested records within the possession, custody, and control of Defendants.

146.   Respondent Defendants are agencies subject to FOIA and must therefore release in response to FOIA requests any non-exempt records and provide a lawful reason for withholding any records. 5 U.S.C. §§ 552(a)(3)(A), (a)(8)(A).

147.   Respondent Defendants' failure to provide all non-exempt responsive records violates FOIA.

**COUNT FIVE**
**VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH**
**AMENDMENT TO THE U.S. CONSTITUTION**

148.   Petitioner Plaintiffs reallege and incorporate by reference all the foregoing paragraphs in this Petition and Complaint as though fully set forth herein.

149.   The Due Process Clause of the Fifth Amendment forbids the government from depriving any "person" of liberty "without due process of law." U.S. Const. amend. V.

150.   Guided by basic notions of due process gleaned from recent Supreme Court and Ninth Circuit case law, the majority of courts across the country have consistently held that an unreasonably prolonged detention under 8 U.S.C. § 1225(b) without an individualized bond hearing violates due process. *See also Yagao v. Figueroa*, No. 17-CV-2224-AJB-MDD, 2019 WL 1429582, at *2 (S.D. Cal. Mar. 29, 2019) ("[T]he Court agrees with the many district courts finding that prolonged detention without a bond hearing likely violates due process.").

151.   For immigrant detainees such as Petitioner Mr. Mendoza, who are detained for no crime but rather are subject to civil detention at the discretion of the agency, constitutional protections are required. These safeguards are significantly more robust because the purpose of immigration detention is to facilitate removal proceedings, *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001), and "detention incidental to removal must bear a reasonable relation[ship] to its purpose." *Tijani v. Willis*, 430 F.3d 1241, 1249 (9th Cir. 2005) (Tashima, J.,

concurring); *see Zadvydas*, 533 U.S. at 690 (2001); *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004), cert. denied, 546 U.S. 820 (2005).

152.   To justify Mr. Mendoza's ongoing prolonged detention, due process requires that the government establish, at an individualized hearing before a neutral decision-maker, that Petitioner's detention is justified by clear and convincing evidence of flight risk or danger, even after consideration whether alternatives to detention could sufficiently mitigate that risk.

153.   Mr. Mendoza has not been afforded an individualized review of his detention. Petitioner has submitted multiple parole applications, but the parole process has not provided Petitioner with a meaningful opportunity to challenge his detention. Mendoza Decl. ¶ 28. The parole denials were issued without a hearing before an immigration judge, or another neutral arbiter, and the denials failed to provide Petitioner with a reason for denial. *Id*. The parole process has failed to be an "opportunity to be heard at a meaningful time and in a meaningful manner." *Marin*, 909 F.3d at 255 (quoting *Mathew*s, 424 U.S. at 333) (internal quotation marks omitted); *see also Diouf II*, 634 F.3d at 1091 (detention procedures are not adequate if they "do not provide for an in-person hearing, they place the burden on the alien rather than the government and they do not provide for a decision by a neutral arbiter such as an immigration judge"). Although Petitioner was scheduled for a bond hearing on January 15, 2021, Petitioner did not actually have a bond

hearing because the immigration judge denied his request for a bond hearing for lack of jurisdiction. Exh. A, Mendoza Decl. ¶ 26; Exh. C, IJ Order Denying Custody Redetermination Request. Subsequently, the immigration judge denied Petitioner's motion to reconsider on the basis of lack of jurisdiction without addressing any of Petitioner's arguments in the motion. Exh. A, Mendoza Decl. ¶ 26; Exh. D, IJ Order Denying Petitioner's Motion to Reconsider. This means that there was no hearing on the substance of the reasonableness of his prolonged detention.

154. Additionally, conditions of confinement for a civil detainee are punitive and violate the Fifth Amendment where: (1) the challenged conditions are expressly intended to punish, or (2) where the challenged conditions serve an alternative, non-punitive purpose but are nonetheless "excessive in relation to the alternative purpose," or are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods. *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004). Legitimate, non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility. *Id.*

155. First, the conditions of Mr. Mendoza's confinement violate the Fifth Amendment because they are expressly intended to punish with no clear legitimate, non-punitive goal. For example, Mr. Mendoza on multiple occasions has been

taken from his housing unit to a solitary confinement space after being the victim of a physical assault by a detainee, which only exacerbated the pain and suffering he had already endured by the beatings. Mendoza Decl. ¶ 30. Mr. Mendoza has remained in solitary for over a month at a time. *Id.* ¶ 34. Because less dangerous and punitive restrictions exist to ensure Petitioner's safety, the use of solitary confinement is punitive. *See Jones*, 393 F.3d at 932.

156.   Respondents' detention of Mr. Mendoza is inherently punitive because Respondents have repeatedly subjected Mr. Mendoza to punitive conditions for exercising his legal rights, requesting medical care, and filing complaints for the crimes committed against him while detained. For example, after he provided the detention officers with a copy of his stay of removal, he was transported to Florence, Arizona and then to San Luis Regional Detention Facility within a matter of days. *Id.* ¶¶ 15, 17, 18, 22. Given that he had counsel trying to assist him, these transfers were unwarranted and blocked his access to counsel. While detained at the San Luis Regional Detention Facility, Mr. Mendoza was sexually harassed and beaten all over his body by another detainee. *Id.* ¶ 20. Mr. Mendoza expressed he wanted to press charges and filed a police report. *Id.* ¶ 24. After filing this police report, Mr. Mendoza was once again transferred and sent back to OMDC. *Id.* Mr. Mendoza has repeatedly asked for medical care, but his requests are not timely

attended to. *Id*. ¶¶ 39, 54-55, 57-61, 65.. Mr. Mendoza has made various complaints while in ICE custody and the deplorable treatment he has endured.

157.   Mr. Mendoza's removal is not imminent as he is pursuing the legal relief available to him and still benefits from a stay of removal from his case before the Ninth Circuit Court of Appeal that he petitioned to be considered *en banc*, and he is now seeking a petition for certiorari before the Supreme Court of the United States. *See Mendoza-Linares v. Garland*, 51 F.4th 1146, 1154 (9th Cir. 2022). Furthermore, as Mr. Mendoza's detention continues to be prolonged, his safety is at risk, as evidenced by the multiple assaults inflicted upon him. This has led him to be placed in solitary confinement under the guise of protecting him, but is ultimately harmful to his well-being and also restricts his access to counsel when in solitary

158.   Mr. Mendoza's mental health continues to rapidly decompensate. His symptoms have been exacerbated since he was placed in segregation (solitary confinement) from on or around April 29, 2021, to June 8, 2021. While in solitary, Mr. Mendoza would cry and had little to no contact with anyone. Mendoza Decl. ¶ 35. In his despair, he would curl in a ball in the corner of his room and bang his head on the door to get the guards' attention. *Id*. Concerningly, the mental torture of isolation exacerbated his respiratory issues and he began having trouble breathing. *Id*. ¶ 39. This deterioration is not surprising, given that civil detention of

indefinite duration can cause "severe and chronic states of stress, helplessness, hopelessness, depression, anxiety and dread."[2] The deleterious effects of prolonged detention are magnified for those who have experienced trauma, like Mr. Mendoza. *Id.* Moreover, solitary confinement, which "is often used as a management tool for individuals with mental illness," has "disastrous psychological and physiological consequences," and often exacerbates mental illness.[3] The humiliating way in which Mr. Mendoza has been treated by the Respondents, especially given their failure to protect him from physical violence and other aggressions in custody, aggravates the effect of his solitary confinement.

159.   Failing to address people's medical needs has had deadly consequences at detention centers.[4] Placing an individual with significant medical and mental health needs in solitary confinement not only exacerbates underlying medical conditions, including any mental health issues, but also creates significant, life-threatening risks. *Id.*

160.   When, as here, "detention crosses the six-month threshold and release or removal is not imminent," an alien detainee's interest in conditional release from detention becomes "profound," and the value of a custody hearing before an

---

[2] Physicians for Human Rights, Punishment Before Justice: Indefinite Detention in the US 9-10, 27-30 (2011) available at https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.
[3] Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, Invisible in Isolation: The Use of Segregation and Solitary Confinement During Immigration Detention 12-14 (2012) available at https://s3.amazonaws.com/PHR_Reports/Invisible-in-Isolation-Sep2012-detention.pdf.
[4] José Olivares, How Solitary Confinement Kills: Torture and Stunning Neglect End in Suicide at Privately Run ICE Prison, The Intercept (Aug. 29, 2019), https://theintercept.com/2019/08/29/ice-solitary-mental-health-corecivic/

immigration judge outweighs any burden imposed on the government. *Diouf II*, 634 F.3d at 1091-92. Consequently, Petitioner is entitled to a custody hearing before an immigration judge.

161.   For these reasons, Mr. Mendoza's ongoing prolonged detention without a hearing violates due process.

**COUNT SIX**
**VIOLATION OF THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION**

162.   Petitioner Plaintiffs reallege and incorporate by reference all the foregoing paragraphs in this Petition and Complaint as though fully set forth herein.

163.   When the government places someone in criminal custody, the Eighth Amendment's prohibition against cruel and unusual punishment imposes an affirmative obligation "to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 200 (1989); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration."). This is so because "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some

responsibility for his safety and general well-being." *DeShaney*, 489 U.S. at 199–200.[5]

164.   Defendant Respondents have affirmatively placed Mr. Mendoza in danger by keeping him detained, but actively transferring between detention centers. *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 888 (E.D. Cal. 2009) (recognizing that crowding in prisons makes "vulnerable outbreaks of communicable disease"). Respondents' ongoing detention of Mr. Mendoza thus continues to expose him to a greater risk of contracting COVID-19 than he would face if he were not in detention and were able to take necessary precautions to protect himself. Second, Respondents have acted, and continue to act, with deliberate indifference to the known and obvious risk of COVID-19 transmission

165.   Additionally, the Eighth Amendment prohibits "[e]xcessive bail." U.S. Const. amend. VIII. The government's categorical denial of bail to certain noncitizens violates the right to bail encompassed by the Eighth Amendment. *See Jennings*, 138 S. Ct. 830 at 871 (Breyer, J, dissenting).

166.   For these reasons, Petitioner's ongoing prolonged detention without a

---

[5] Conditions of criminal confinement constitute cruel and unusual punishment under the Eighth Amendment when: (1) the conditions pose "a substantial risk of serious harm" and (2) government officials are deliberately indifferent to that risk. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). The Supreme Court has explicitly held that a criminal prisoner's potential exposure to a serious, communicable disease can establish the first factor of the Eighth Amendment analysis, even if the risks of exposure have yet to occur. *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

bond hearing violates the Eighth Amendment.

## **PRAYER FOR RELIEF**

For these reasons, AOL asks that the Court grant the following relief:

A. Declare that Respondent Defendant ICE has failed to: timely respond to Plaintiff's request for agency records; grant expedited processing of Petitioner Plaintiffs' requests; conduct an adequate search for responsive records; and produce non-exempt responsive records, each in violation of FOIA, 5 U.S.C. § 552;

B. Order Respondent Defendants to conduct a reasonable search for records responsive to Petitioner Plaintiffs' FOIA request;

C. Order Defendants to produce, within 20 days of the Court's order, or by a date deemed appropriate by the Court, non-exempt records responsive to Plaintiff's FOIA requests and indexes justifying the withholding of responsive records pursuant to FOIA exemptions;

D. Order Defendants to grant expedited processing of the Request pursuant to 5 U.S.C. § 552(a)(6)(E)(iii) and 6 C.F.R. § 5.5(e);

E. Enjoin Defendants from continuing to withhold any and all non-exempt records responsive to Plaintiff's FOIA request;

F. Issue a Writ of Habeas Corpus and order Petitioner's immediate release, with appropriate public health measures, on the ground that his continued detention

violates the Due Process Clause;

G. In the alternative, issue a Writ of Habeas Corpus and order Mr. Mendoza's release within 30 days unless Respondent Defendants schedule a hearing before an immigration judge where: (1) to continue detention, the government must establish by clear and convincing evidence that Petitioner presents a risk of flight or danger, even after consideration of alternatives to detention that could mitigate any risk that Mr. Mendoza's release would present; and (2) if the government cannot meet its burden, the immigration judge order Mr. Mendoza's release on appropriate conditions of supervision, taking into account Mr. Mendoza's ability to pay bond and alternatives to detention;

H. Enter judgment declaring that Respondent Defendants' continued detention of Mr. Mendoza violates the Due Process Clause of the Fifth Amendment and the Eighth Amendment;

I. Award Mr. Mendoza reasonable attorneys' fees and other litigation costs reasonably incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E) and the Equal Access to Justice Act (5 U.S.C. § 504; 28 U.S.C. § 2412); and Award all other and further relief the Court deems just and proper.

Dated: July 14, 2023                                   Respectfully, Submitted,

Diego J. Aranda Teixeira