Diego J. Aranda Teixeira
AL OTRO LADO, INC.
634 S. Spring St. Suite 908
Los Angeles, CA 90014
Telephone: 253-882-8071
Email: diego@alotrolaodo.org

Pro Bono Attorney for Petitioner
HEVER ALBERTO MENDOZA LINARES

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEVER ALBERTO MENDOZA LINARES, AL OTRO LADO | CIVIL CASE NO.: 3:23-cv-01094-TWR-KSC |
| Petitioner, | |
| v. | **TABLE OF CONTENTS - EXHIBITS** |
| MERRICK GARLAND, United States Attorney General, ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; JAMES DOBSON, Otay Mesa Detention Center Officer in Charge, Immigration and Customs Enforcement; CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center, | |
| Respondents. | |

| | | |
|---|---|---|
| EXHIBIT A | Mr. Mendoza's Declaration and English translation of Dec w Spanish language original reviewed by Mr Mendoza, with certificate of translation | 3-46 |
| EXHIBIT B | Parole Denial dated June 9, 2020 | 47 |
| EXHIBIT C | Immigration Judge Order Denying Custody Redetermination Request | 48 |
| EXHIBIT D | Immigration Judge Order Denying Petitioner's Motion to Reconsider | 49-50 |
| EXHIBIT E | Parole Denial dated May 14, 2021 | 51-52 |

TABLE OF CONTENTS-EXHIBITS

# EXHIBIT A

DIEGO J. ARANDA TEIXEIRA
California State Bar No.  344956
AL OTRO LADO, INC.
634 S. Spring St. Suite 908
Los Angeles, CA 90014
Telephone: 253-882-8071
Email: diego@alotrolado.org

*Pro Bono* Attorney for Petitioner


## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEVER ALBERTO MENDOZA LINARES, | CIVIL CASE NO.: |
| Petitioner, | |
| v. | **DECLARATION OF HEVER ALBERTO MENDOZA LINARES IN SUPPORT OF HABEAS PETITION**[1] |
| MERRICK GARLAND, United States Attorney General, ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security, GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; JAMES DOBSON, Otay Mesa Detention Center Officer in Charge, Immigration and Customs Enforcement; CHRISTOPHER J. LAROSE, Senior Warden, Otay Mesa Detention Center, | |
| Respondents.. | |

---

[1] This declaration was composed in Spanish, and an interpreter conveyed its contents to Mr. Mendoza in Spanish, his native language. The interpreter has signed a certificate of interpretation found at the end of this declaration.

1. My name is Hever Alberto Mendoza Linares. I was born on April 18, 1986 in Usulutan, El Salvador. I am 36 years-old and I am a Salvadoran national.

2. I entered the United States through Tecate, California, on or around February 10, 2020, after fleeing persecution in my home country. I was apprehended by immigration officers and told I was going to be removed immediately. I have no other immigration history in the United States.

3. Immigration authorities took me to a station for processing, where I was eventually placed in a solitary room for about 4 days.

4. During my processing interview, I answered all the officer's questions. I explained to the officer that I was not a gang member and I had never committed any crimes. I explained how I had been investigated for a sexual assault allegation in El Salvador but I was found to have nothing to do with it. I do not have any criminal convictions and explained this to the officer. The officer repeated questions to me and I always answered truthfully.

5. On February 14, 2020, they brought me to the Otay Mesa Detention Facility.

6. On or around March 14, 2020, I was moved to Adelanto Detention Facility without being given a reason. From what I remember, I spent about four days at the Adelanto Detention Facility and then I was returned to Otay Mesa Detention Facility again.

7. Sometime in March 2020, I was scheduled for my first interview with an asylum officer because I was fearful of returning to my home country, they called it a Credible Fear Interview ("CFI"). I did not have an attorney with me at that time and had my CFI rescheduled. At my next interview appointment, approximately 15 days later, I informed ICE that I was not able to find counsel and that I would continue on my own. I then proceeded to do my CFI.

8. During the interview when I did not understand a question and I asked the official about it they would get mad. Ultimately, I received a negative result from this CFI.

9. At the time, I was housed in the part of the detention center called L POD. During this time, I made a complaint to OMDC because I, along with other detainees, was being transferred to another part of the detention center called M pod. We made a complaint because in M pod there were active gang members and I did not want to be housed there because I feared for my safety. It was not until we were in M pod that we were told that we were moved because they needed space for the people sick with COVID-19.

10. As I heard news about the COVID-19 virus, I began to fear for my health. The staff was not giving us any protective gear or taking precautions to protect us.  The staff took us to Units N and P, quarantine units, to clean with

no protection. We were given snacks and foods such as Subway and pizza. Officers told detainees to eat the food there and not tell anyone. Because of this, many of us decided to go on a hunger strike. I participated in the hunger strike because I believed that was going to be the only way ICE would listen to our requests for protection. We were finally given some face masks after our collective efforts to make our voices heard with the hunger strike.

11. In approximately March 2020, I was assaulted by a detainee named Zelaya. Zelaya punched me in the face. The guards did not notice this assault. It was only until I told them that Zelaya hit me that they had to investigate. When I told them this, I was taken to a room and we looked at the video footage and the officers saw that I was telling the truth. They placed that detainee in segregation and returned me to my unit, but did not do anything else.

12. I asked to see a judge regarding my negative credible fear finding from my CFI decision and on approximately May 27, 2020, I had a hearing to review the decision. The whole hearing lasted about fifteen minutes. The Immigration Judge affirmed ICE's negative credible fear finding. I was not given a reason why. I was told I would be removed from the United States immediately.

13. On June 1, 2020, a legal aid organization called Al Otro Lado submitted a request that I be released from detention on my behalf due to my medical

vulnerabilities. I think they said this was called a *Fraihat* parole request. ICE denied my parole request on June 9, 2020.

14. On June 8, 2020, another attorney named Shannon Johnson from The Florence Project, a legal nonprofit organization, helped me prepare my documents so I could file what I was told is called a Petition for Review with the Ninth Circuit Court of Appeals. I understood this was something to challenge the decision of the Immigration Judge about my negative CFI decision. I filed this in my own name, I just got help to be able to do so. The Ninth Circuit did something so I would not be removed from the United States, I think I was told that they gave me a stay of removal.

15. On June 9, 2020 I was taken to intake and given my clothes. Two officials came to tell me that I was going to be removed. I tried to tell the ICE officials that my deportation had been stopped. I gave the official my Ninth Circuit Case number, which is 20-71582 and information regarding my stay of removal. The official said he was not going to call anyone and threw away the paper I gave him.

16. I was told to sign a document I have since been told was a "failure to depart" warning document. Originally, the officer told me to sign the English document that they said was supposedly to ask for more time in this country. I refused to sign it because the document was in English and I could not

understand what the document said. Also, I suspected I was being lied to about this document because the paper they wanted me to sign had the word "depart" on it and I believed this meant deportation, so I did not sign it. After I refused to sign, I was told by the official who wanted me to sign it that it did not matter because I would still be removed.

17. I was placed into a plane and taken to Florence, Arizona where I stayed at the Florence Detention Facility for about 3 days from what I remember.

18. On June 12, 2020 officials in a van came to transport me. I thought I was being taken back to OMDC but I was taken to San Luis Regional Detention Facility. On the way there we were not given any food or water. I was at San Luis Regional Detention facility until around August 20, 2020 from what I remember.

19. While I was at San Luis Regional Detention Facility, I received a legal call from an asylum officer and they asked me if my counsel was Shannon Johnson. I told them yes and they told me they would send her a letter. And then I was sent back to my unit.

20. Maintaining contact with my attorney was difficult because ICE kept transferring me around. During this time I did not know what was going on with my case or what they were doing with me. They didn't even let me get a phone call so I could inform my attorney that I was being moved. I felt

helpless and lost. I was also scared for my safety because ICE was transferring me in a pandemic, and because of this ICE exposed me to the risk of getting sick with COVID.

21. On July 4, 2020 while I was at San Luis Regional Detention Facility I was beaten by a detainee there. I had made a report on July 3, 2020 because that detainee was sexually harassing me by touching my buttocks. His behavior triggered memories of past abuse for me. On July 4, 2020, we were in the day room and I changed the channel on the TV, when all of a sudden he began to beat me all over my body. He punched me in the face, neck and back. I still have lingering pain from this beating. After he beat me up, the ICE officers placed me in solitary confinement. I decided to press charges and an officer came to take my statement like 12 or 13 days after. I was eventually transferred and do not know if they kept investigating this crime against me. I do not think they did because they never followed-up with me, but instead just transferred me.

22. Around July 20, 2020 I was transferred again and brought back to OMDC. Again during this trip I was not given any food or water. I was placed in quarantine for approximately 16 days. Every time I've been transferred, I've had to be quarantined.

23. On July 31, 2020, while I was in quarantine in the medical area, I was called and told I had a call. It turned out that that call was with an asylum officer. I believe that I had a re-interview with an asylum officer and that there was an interpreter on the line. Attorney Johnson was present telephonically during my interview this time. It turns out that she had requested a reconsideration of my original negative CFI or a second credible fear interview with the asylum office. I was thankful to have an interview with my attorney present. I remember the interview lasted for about three hours. I never received my results from this second interview, but Attorney Johnson received notice on that day of July 31st that my reconsideration request was denied.

24. Around October 6, 2020 I was physically assaulted again by another detainee named Hugo Chavarria. While I was in front of a computer, Chavarria kicked me in the right ribcage area. After I was kicked, I fell to the floor. Chavarria repeatedly kicked me. Chavarria then grabbed a chair and hit me in the head. My injury was so severe that I had to be in a wheelchair for approximately 17 days. The guards did not act quickly and I was in severe pain. I filed a police report with the San Diego Police Department.

25. In January 2021, I had a custody redetermination hearing. At that time, I did not have legal representation. I appeared on my own without a lawyer. The

judge denied my bond hearing request because of what was going on in my case. I think this was because he said I was in what he called expedited removal proceedings since I had a negative CFI result stemming from my interview.

26. After my bond hearing, I asked for legal help from the organization Al Otro Lado. An attorney from Al Otro Lado, Priscilla Merida, helped me by filing a document she called a Motion to Reconsider the Judge's decision. I was informed that the government opposed the motion because they said that the Judge did not have jurisdiction. The Immigration Judge agreed with the government believing he did not have authority to hear my bond hearing request. He did not address my attorney's arguments or the cases she brought up. I felt hopeless because I had been detained for a year at that point.

27. I appealed to the Board of Immigration Appeals the Immigration Judge's denial of my bond hearing request. Al Otro Lado referred me to an attorney named Brian Baran who is helping me for free with the appeal of my bond case, as well as with my Ninth Circuit Case. My attorney filed a bond appeal for me on May 14, 2021.

28. On February 18, 2021, my attorney, Ms. Merida, from Al Otro Lado sent another parole request to my ICE Deportation Officer. In the afternoon of March 4, 2021, an ICE Officer called Ms. Merida and told her that they were

denying my parole request because I was subject to mandatory detention. The officer dismissed my attorney's arguments and did not even provide her or me with a physical copy of their denial decision explaining their reasoning.

29. On April 13, 2021, I was once again beaten, this time it was by another detainee named Avila. I tried to cover myself but Avila kept punching me. The guards pepper sprayed him but since I was close the spray also affected me. I was taken to the medical office to wash off the chemicals after this assault. I filed a report of the assault but I have yet to hear of the outcome.

30. Even though I was the victim I was placed into segregation and I was not let out until April 23, 2021. I was only free for a few days because on April 29, 2021, I was placed back in solitary confinement. I was told that I was being placed in solitary confinement for my own safety.

31. When I was escorted out of the pod I was restrained by my wrist and ankles while being filmed. They treated me like I was being disciplined even though I was a victim in all the assaults I have faced while in detention. I felt humiliated by the officers.

32. I was placed into a bathroom for about an hour. Not knowing what was happening I started to bang on the walls to get an officer's attention. After this an officer came and told me I was going to the medical office. When I

was taken to the medical office, I spoke with a psychiatrist. The psychiatrist asked me if I had any suicidal thoughts. I told the psychiatrist that I did not. An officer was interpreting this. I asked whether I was going to be taken to observation. The officers that were there said something in English. This is not normal when someone goes to the medical office, there is supposed to be another person there interpreting for the patient, not an officer. The officers then grabbed me and placed me into observation.

33. In observation I was thrown down and stripped of my clothes. I was given a green sheet. I spent a night in this room and the next day I was returned to solitary and was there until June 8, 2021.

34. My time in solitary has been extremely difficult for me. On that occasion, I spent a total of one month and eight days there through no fault of my own.

35. While I was in solitary I was severely depressed. I would cry out of the sadness I felt being in there. At times I would curl in a ball in the corner of the room. I even banged my head on the glass on the door just to get their attention.

36. It got to the point where I had thoughts of hurting myself. I did not say anything because I would be sent to the room with the green sheet again.

37. I felt very isolated. I had little to no contact with anyone. I was in a one man cell. I was always by myself. I was supposed to have 2 hours of yard time

but it was never the full time because I had to share the time with the others who were in segregation. They would offer me yard time at around 6 or 7 in the morning during the coldest time.

38. When I would go out to the yard, I was in a cage. When I was allowed to watch TV in the rec room, I would also be in a cage.

39. Being in solitary also exacerbated my medical issues like my respiratory issues and my mental health. I have lung problems due to smoking cigarettes in the past and my work while being a DJ because there was always smoke in the audience. In El Salvador I was told by a doctor that I had to take medication for it. While in El Salvador I did take medication for it but since being detained I have not had access to those medications. I have not had access to those medications. I did have a radiography done but the medical staff at the facility tell me I am fine which I know not to be the case. I am worried about what my real lung condition could be. While I was in solitary, I often felt I had a harder time breathing.

40. On May 11, 2021, my attorney submitted another parole request with my deportation officer and the San Diego ICE office. Days later I received a document from ICE saying they were denying my parole request.

41. I continued to be kept in the solitary housing unit ("SHU"). An officer even told me I would remain in the SHU until my case was over. I pleaded to be

let out of solitary. I was scared because I did not think I could survive being in solitary one more day so I decided to go on a hunger strike.

42. I believe it was only because I went on a hunger strike that I was released from the SHU.

43. On May 29th, 2021, I started refusing food. Eventually, I also placed a sign on my cell door declaring I was on hunger strike. On June 6th, 2021 the guards came and took my commissary.

44. On June 6th, I made a request to speak with the Officer in Charge. These are ICE's supervisors and they are higher up than ICE's complaint department. Then on or around June 7th at 7 AM, Officer Fuentes, an ICE supervisor, came to convince me to stop my hunger strike. He offered me to work for 1 hour a day for more access to the television. I was not looking for favors, I just wanted to be taken out of solitary because I felt I would not survive the mental torture anymore. I refused so I continued with my hunger strike.

45. On the same day of June 7th at 8 AM, Officer Flores came and tried to convince me to eat. I refused and he told me someone would come to talk with me.

46. Later a woman came, her last name was something like Beckam. She said she was the head of immigration. She wore a jacket that had the letters ERO on it which is a part of ICE. She said she did not want to know about the

other things. She asked me what it would take to get me to eat. I told her I did not want to be here. to which she asked what I was referring to the unit, facility, country. I told her I was referring to the solitary area I was at, I did not have access to anything meaning yard time, recreational time, phone use so I could speak with my attorney. She left and I stayed in the cage.

47. Officer Flores then came with Chief of Security Mora and told me they wanted to make a deal with me. They offered to place me in M pod but I could not go there because of the politics there, these being the rules which the gangs in the pod impose including taxes in the form of soups and the violence that takes place in the pod which is a lot because there are fights regularly in that pod. I had already been beaten before and was scared it would happen again if I went there. They offered me more recreational hours but I refused, because it meant I would still be alone in solitary during the rest of the day. I was not well and they knew this because I kept telling them. They tried to bribe me with outside food, but I refused because I told them they would not buy me off. Finally, they told me that if I ate, there could be a 95 percent chance that they could put me back in my old pod. Just wanting to get out of solitary, I agreed and ate a peanut butter and jelly sandwich. They then said they would come back tomorrow and when they did they instructed me to put my head down and to say that I would follow the

program, meaning continue with my case without any problems, but I told them why should I put my head down if I had done nothing wrong. I told them I just wanted to do my program. The next day on June 8, 2021, I was finally returned to the general population in the same pod with people who had previously attacked me.

48. I did not stay safe because on June 14, 2021 I was once again assaulted by Chavarria. I was playing dominos at a table and Chavarria came at me with a broom handle. Another detainee tried to take the stick from Chavarria to defend me, but was not able to so he was beaten badly with the stick. I tried to defend myself and then another detainee named Perez tried to hit me. I ran into a cell and tried to close the door, but it did not close all the way. So, I tried to hold the door and that same detainee along with another named Stanley opened the door and pulled me by the hair and then they began to hit me in the head. Guards came and threw tear gas. The two detainees who beat me lied and said I was the aggressor and I was sent to solitary confinement. I also had my phone, commissary, and recreational time taken away.  I feel hopeless and want to give up, but I cannot give up.

49. I have thought about starting a hunger strike again, but fear that it would only lead to me being transferred or isolated again.

50. On July 19, 2022, I was put in solitary confinement again. I was trying to contact someone in El Salvador on the tablets at the detention center. As I was typing in the email address, the tablet auto populated and entered the email address with the last name "Gallina," but I was trying to type in a different last name that also started with a "G." The email address that was auto populated belonged to an officer at Otay Mesa. It was not my intention to send the email to the officer, but I was still put into solitary confinement for this innocent mistake.

51. I started a second hunger strike while I was in solitary confinement, from July 19th through July 28th. On July 28th I went to the medic and broke my hunger strike because of my poor health conditions. On July 29th, I was returned to solitary. On August 5th, I had an appointment with the medic because I wasn't doing well. On August 6th, I took a COVID-19 test and was positive. I was taken back to solitary to finish my punishment and be in quarantine.

52. My solitary confinement finally ended on August 19th, and I was taken back to E pod. At that time, everyone in E pod was in quarantine. They told me that I was immune from COVID-19 for 90 days because I had just had COVID-19 and had me quarantine among everyone else in E pod for six months.

53. During my time in solitary I would constantly get headaches. I've had about 2-3 a week. I would hit the panic button and they would speak to me in English and I would tell them about my problems and they would tell me to sign up for the doctors.

54. At times I have trouble breathing. My breathing issues also come from another condition that I have in my throat. I am constantly hacking and coughing. All I have been given for this is Tylenol and told to gargle water with salt.

55. It is very hard to get any good medical care. If you need to see a doctor at night you are just told to wait and sign up for a visit in the morning. When I do see the medic, I have to make an appointment the same day around 6 in the morning. Then you are called throughout the day to see a nurse, not a doctor, and usually just given acetaminophen/Tylenol.  I tell them that I want to see a doctor but you have to be practically dying to see a doctor to make an appointment for you. Even when you do go, they do not listen to you.

56. In March 2020, a licensed social worker diagnosed me with something called an Adjustment Disorder with mixed anxiety and depressed mood. I get depressed and anxious and I know my mental health has only continued to worsen.

57. On October 28th, 2020 I had a study at Alvarado Medical Center in San Diego. A doctor told me I might have a tumor or blood clot. This worried me and I kept asking about it, but was not given answers. I did not see a urologist again until April 2021.

58. On April 26, 2021 I was taken to a hospital in San Diego and given some antibiotics. I had to be seen by a urologist due to an injury in my testicles I received from the beating during my time at San Luis Regional Detention Facility. I still experience testicular pain and I am afraid for my health. I believe the medical staff here do not treat people or listen to them because I have experienced this and seen others also not be heard.

59. I feel bad and I continue to feel worse every day. I get charged for every request that I make for copies of medical requests, but despite those charges, I still frequently send requests. In December of 2022, I started to get terrible migraines. These migraines have been persistent and still occur. I believe they are occurring because of my excessive coughing caused by my acid reflux inflammation. I take about five Tylenol pills every night for migraines.

60. On March 15th, 2023, I was coughing blood and had a fever. Many people in my pod were extremely ill during that week. On March 16th, I was waiting in a legal visit room for my attorney's office to drop off a document. I started

to feel extremely dizzy and felt like I was going to faint. I requested to go to medical. The guards brought me to medical, but I was not seen by a nurse or the doctor. They just sent me back to my pod. I kept requesting to see a medic, but I was denied every time. I eventually told a guard that if I didn't get to see a medic or call a higher authority, I would throw myself on the floor and they would have to call in "Man Down." They sent me to medical after that. The nurse just told me that I didn't look well and gave me Tylenol. I made a medical grievance complaint after that.

61. I was also told that I would not be able to see a nurse or a doctor because I have an upcoming hospital appointment, but they would not tell me when my hospital appointment is due to "safety concerns." Not only am I being denied access to the doctor, but I am being denied information about supposed appointments that are made for me.

62. I cannot eat here because the food gives me significant acid reflux and causes me pain. I have lost a ton of weight because I cannot eat. I never eat breakfast and I often skip other meals. One time when I brought up my stomach pain to the doctor, she told me that I could try a "liquid diet." The next day I told her that I wanted to try the liquid diet and she sternly told me there would be no liquid diet for me and to not ask again. I have also tried to get kosher meals here at Otay Mesa to see if it would help, but was denied

and told to complete a lot of documentation, including a document declaring that I am Jewish, and to comply with other requirements. After multiple attempts, I was finally granted a three-month kosher meal plan in April 2023.

63. I am mentally unwell. I want to receive mental health help and be able to talk to a psychologist, but I am afraid of the psychologist Dr. Fernbach here at Otay. She has many complaints against her, and has even been reported in the news for this.[2] One time when she saw me crying, instead of helping me or talking to me, she put me in an isolated room on suicide watch.

64. I constantly have nightmares about being shot. The feeling of being shot in my dream wakes me up feeling terrified. I cannot share this issue with the medical staff at Otay Mesa because I fear being isolated again.

65. While I have been in OMDC I have been in pods where I was exposed to Covid. This happened while I was in M pod where someone died due to the virus. Recently a lot of people have had cold symptoms and have not been feeling well. I know people with prolonged coughs, runny noses, inflamed private parts, and other medical issues. However, people are hesitant to report these medical issues because they fear being in quarantine. We once had a six-month long quarantine.

---

[2] https://www.sandiegouniontribune.com/news/immigration/story/2022-03-08/detainees-mental-health-otay-mesa

66. Our living quarters are very overpopulated. I was once told by the Otay Mesa manager that our pod area can only fit 20 people. There are currently about 59 people in our pod.

67. During my lengthy time at OMDC, I have made various complaints about the detention centers and what has happened to me. I have made police reports for the crimes committed against me. I believe I have been treated unfairly and even placed in solitary as retaliation because I speak out. For example, on May 5, 2021, I was told by an officer that I was going to remain in solitary confinement until my case was over. In the past month I was also told I would be transferred to another facility called GEO in Downtown San Diego. Then they told me I might be transferred to a different facility. I do not know why they keep saying these things to me. I do not believe this is right. I feel like they are punishing me for fighting my case.

68. I have now been detained in ICE custody for over 40 months. I have been assaulted and treated as less than human while detained. My mental health has only worsened and I am fearful of continuing to remain detained. I have already been beaten 5 times and ICE has not protected me, but instead punished me by putting me in solitary. I have even filed police reports, but I am starting to think that they do not really investigate because I am a detained immigrant to them.

69. I have been on a hunger strike since June 22nd, 2023, as a response to being unjustly placed in segregation. I have had issues with seeking access to the medication I need for my medical condition, and the ACLU is helping me with a complaint about this that I believe remains pending.

70. I just ask for an opportunity to continue fighting my case in a safe environment. I feel like I can't participate in my case while in detention. When I ask an officer about my case, they deny me any information or tell me that I will be deported. I never know about my case unless I speak to my attorneys and it costs money for me to make those calls. I don't have access to many resources and my health is declining. Detention centers are not safe environments.

71. If I were released, I would live in Park Ridge, Illinois with my sponsors Beth Hillman and Juan Villalobos, both U.S. Citizens. My sponsors have agreed to let me live with them if I am released.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 23, 2023 in San Diego, California.

**HEVER ALBERTO MENDOZA LINARES**
Declarant

## <u>CERTIFICATE OF INTERPRETATION</u>

I declare that I am proficient in the English and Spanish languages to orally translate and interpret and the foregoing was read to Hever Alberto Mendoza Linares in Spanish before he signed the declaration. I further declare that I am competent to render this translation and that I would testify to the same penalty of perjury if I were called upon to do so.

Yvette Aguayo
_____

_____

1. Mi nombre es Hever Alberto Mendoza Linares. Nací el 18 de abril de 1986 en Usulután, El Salvador. Tengo 36 años y soy de nacionalidad salvadoreña.

2. Ingresé a los Estados Unidos a través de Tecate, California, alrededor del 10 de febrero de 2020, después de huir de la persecución en mi país de origen. Los oficiales de inmigración me detuvieron y me dijeron que me iban a sacar de inmediato. No tengo otro historial de inmigración en los Estados Unidos.

3. Las autoridades de inmigración me llevaron a una estación de procesamiento, donde finalmente me colocaron en una habitación solitaria durante unos 4 días.

4. Durante mi entrevista de procesamiento, respondí todas las preguntas del oficial. Le expliqué al oficial que yo no era pandillero y que nunca había cometido ningún delito. Le expliqué cómo me habían investigado por una acusación de agresión sexual en El Salvador, pero se descubrió que no tenía nada que ver con eso. No tengo condenas penales y le expliqué esto al oficial. El oficial me repetía preguntas y siempre respondía con la verdad.

5. El 14 de febrero de 2020 me llevaron al Centro de Detención de Otay Mesa.

6. El 14 de marzo de 2020 o alrededor de esa fecha, me trasladaron al centro de detención de Adelanto sin darme una razón. Por lo que recuerdo, pasé unos cuatro días en el Centro de Detención de Adelanto y luego me devolvieron al Centro de Detención de Otay Mesa nuevamente.

7.En algún momento de marzo de 2020, tenía programada mi primera entrevista con un oficial de asilo porque tenía miedo de regresar a mi país de origen, lo llamaron Entrevista de miedo creíble ("CFI"). No tenía un abogado conmigo en ese momento y reprogramaron mi CFI. En mi próxima cita para la entrevista, aproximadamente 15 días después, informé a ICE que no podía encontrar un abogado y que continuaría por mi cuenta. Luego procedí a hacer mi CFI.

8.Durante la entrevista, cuando no entendía una pregunta y le preguntaba al funcionario al respecto, se enojaba. Finalmente, recibí un resultado negativo de este CFI.

9.En ese momento, estaba alojado en la parte del centro de detención llamada L POD. Durante este tiempo, presenté una queja a la OMDC porque yo, junto con otros detenidos, estábamos siendo transferidos a otra parte del centro de detención llamada M pod. Hicimos una denuncia porque en el M POD había pandilleros activos y yo no quería que me alojaran allí porque temía por mi seguridad. No fue hasta que estuvimos en el módulo M que nos dijeron que nos cambiaron porque necesitaban espacio para las personas enfermas con COVID-19.

10.Cuando escuché noticias sobre el virus COVID-19, comencé a temer por mi salud. El personal no nos dio ningún equipo de protección ni tomó precauciones para protegernos. Debido a esto, muchos de nosotros decidimos hacer una huelga de hambre. Participé en la huelga de hambre porque creía que esa sería la única

forma en que ICE escucharía nuestras solicitudes de protección. Finalmente nos dieron algunas máscaras después de nuestros esfuerzos colectivos para hacer que nuestras voces se escucharan con la huelga de hambre.

11. Aproximadamente en marzo de 2020 fui agredido por un detenido de nombre Selaya. Selaya me golpeó en la cara. Los guardias no se dieron cuenta de este asalto. Fue solo hasta que les dije que Selaya me golpeó que tuvieron que investigar. Cuando les dije esto, me llevaron a una habitación y miramos el video y los oficiales vieron que estaba diciendo la verdad. Pusieron a ese detenido en segregación y me devolvieron a mi unidad, pero no hicieron nada más.

12. Solicité ver a un juez con respecto a mi entrevista de miedo creíble que fue negativo y aproximadamente el 27 de mayo de 2020, tuve una audiencia para revisar la decisión. Toda la audiencia duró unos quince minutos. El Juez de Inmigración afirmó la decisión negativa de miedo creíble de ICE. No me dieron una razón por qué. Me dijeron que me sacarían de los Estados Unidos inmediatamente.

13. El 1 de junio de 2020, una organización llamada Al Otro Lado presentó una solicitud para que me liberaran de la detención en mi nombre debido a mis vulnerabilidades médicas. Creo que dijeron que esto se llamaba solicitud de libertad condicional de Fraihat. ICE negó mi solicitud de libertad condicional el 9 de junio de 2020.

14. El 8 de junio de 2020, otra abogada llamada Shannon Johnson de The Florence Project, una organización legal sin fines de lucro, me ayudó a preparar mis documentos para poder presentar lo que me dijeron que se llama Petición de revisión ante el Tribunal de Apelaciones del Noveno Circuito. Entendí que esto era algo para impugnar la decisión del Juez de Inmigración sobre mi decisión negativa de CFI. Presenté esto a mi nombre, acabo de recibir ayuda para poder hacerlo. El Noveno Circuito hizo algo para que no me sacaran de los Estados Unidos, creo que me dijeron que me dieron una suspensión de deportación.

15. El 9 de junio de 2020 me llevaron a admisión y me dieron mi ropa. Dos oficiales vinieron a decirme que me iban a sacar. Traté de decirles a los oficiales de ICE que mi deportación había sido detenida. Le di al funcionario mi número de Caso del Noveno Circuito, que es 20-71582 e información sobre mi suspensión de deportación. El funcionario dijo que no iba a llamar a nadie y tiró el papel que le di.

16. Me dijeron que firmara un documento que, desde entonces, me dijeron que era un documento de advertencia de "falta de salida". Originalmente, el oficial me dijo que firmara el documento en inglés que supuestamente era para pedir más tiempo en este país. Me negué a firmarlo porque el documento estaba en inglés y no podía entender lo que decía. Además, sospeché que me estaban mintiendo sobre este documento porque el papel que querían que firmara tenía la palabra "depart" y

pensé que significaba deportación, así que no lo firmé. Después de que me negué a firmar, el funcionario que quería que lo firmara me dijo que no importaba porque de todos modos me iban a deportar.

17.Me colocaron en un avión y me llevaron a Florence, Arizona, donde me quedé en el centro de detención de Florence durante unos 3 días, por lo que recuerdo.

18.El 12 de junio de 2020 llegaron funcionarios en una camioneta a transportarme. Pensé que me iban a llevar de vuelta a la OMDC, pero me llevaron al Centro de Detención Regional de San Luis. En el camino no nos dieron comida ni agua. Estuve en el centro de detención regional de San Luis hasta alrededor del 20 de agosto de 2020, por lo que recuerdo.

19.Mientras estaba en el Centro de Detención Regional de San Luis, recibí una llamada legal de un oficial de asilo y me preguntaron si mi abogada era Shannon Johnson. Les dije que sí y me dijeron que le enviarían una carta. Y luego me enviaron de regreso a mi unidad.

20.Mantener contacto con mi abogada fue difícil porque ICE no dejaba de trasladarme. Durante ese tiempo no sabía qué estaba pasando con mi caso ni qué estaban haciendo conmigo. Ni siquiera me dejaron llamar por teléfono para informarle a mi abogada que me iban a mudar. Me sentí impotente y perdido. También tenía miedo por mi seguridad porque ICE me estaba trasladando en una pandemia, y por eso ICE me expuso al riesgo de enfermarme de COVID.

21. El 4 de julio de 2020, mientras estaba en el Centro Regional de Detención de San Luis, un detenido me golpeó allí. Había hecho una denuncia el 3 de julio de 2020 porque ese detenido me estaba acosando sexualmente tocándome las nalgas. Su comportamiento me provocó recuerdos de abusos pasados. El 4 de julio de 2020 estábamos en la sala  y cambié de canal en la tele, cuando de repente me empezó a pegar por todo el cuerpo. Me golpeó en la cara, el cuello y la espalda. Todavía tengo un dolor persistente de esta paliza. Después de que me golpeó, los oficiales de ICE me pusieron en confinamiento solitario. Decidí presentar cargos y un oficial vino a tomarme declaración como 12 o 13 días después. Finalmente me trasladaron y no sé si siguieron investigando este crimen en mi contra. No creo que lo hicieran porque nunca hicieron un seguimiento conmigo, sino que simplemente me transfirieron.

22. Alrededor del 20 de julio de 2020, me transfirieron nuevamente y me trajeron de regreso a OMDC. Nuevamente, durante este viaje no me dieron comida ni agua. Me pusieron en cuarentena durante aproximadamente 16 días. Cada vez que me transfirieron, tuve que ponerme en cuarentena.

23. El 31 de julio de 2020, mientras estaba en cuarentena en el área médica, me llamaron y me dijeron que tenía una llamada. Resultó que esa llamada era con un oficial de asilo. Creo que tuve una nueva entrevista con un oficial de asilo y que había un intérprete en la línea. La abogada Johnson estuvo presente

telefónicamente durante mi entrevista esta vez. Resultó que ella había solicitado una reconsideración de mi CFI negativo original o una segunda entrevista de miedo creíble con la oficina de asilo. Estaba agradecido de tener una entrevista con mi abogada presente. Recuerdo que la entrevista duró unas tres horas. Nunca recibí los resultados de esta segunda entrevista, pero la abogada Johnson recibió un aviso ese día 31 de julio de que mi solicitud de reconsideración fue denegada.

24. Alrededor del 6 de octubre de 2020 fui nuevamente agredido físicamente por otro detenido de nombre Hugo Chavarria. Mientras estaba frente a una computadora, Chavarría me dio una patada en el área de la caja torácica derecha. Después de que me patearan, caí al suelo. Chavarria me pateó repetidamente. Chavarria luego agarró una silla y me golpeó en la cabeza. Mi lesión fue tan grave que tuve que estar en una silla de ruedas durante aproximadamente 17 días. Los guardias no actuaron con rapidez y yo sufría mucho. Presenté un informe policial en el Departamento de Policía de San Diego.

25. En enero de 2021, tuve una audiencia de redeterminación de custodia. En ese momento, no tenía representación legal. Me presenté por mi cuenta sin un abogado. El juez rechazó mi solicitud de audiencia de fianza debido a lo que estaba pasando en mi caso. Creo que esto se debió a que dijo que yo estaba en lo que él llamó un proceso de deportación acelerada ya que obtuve un resultado CFI negativo derivado de mi entrevista.

26. Después de mi audiencia de fianza, pedí ayuda legal a la organización Al Otro Lado. Una abogada de Al Otro Lado, Priscilla Mérida, me ayudó presentando un documento que llamó Moción para reconsiderar la decisión del juez. Me informaron que el gobierno se opuso a la moción porque dijeron que el Juez no tenía jurisdicción. El Juez de Inmigración estuvo de acuerdo con el gobierno creyendo que no tenía autoridad para escuchar mi solicitud de audiencia de fianza. No abordó los argumentos de mi abogada ni los casos que ella planteó. Me sentí desesperado porque había estado detenido durante un año en ese momento

27. Apelé ante la Junta de Apelaciones de Inmigración la negativa del Juez de Inmigración de mi solicitud de audiencia de fianza. Al Otro Lado me refirió a un abogado llamado Brian Baran que me está ayudando de forma gratuita con la apelación de mi caso de fianza, así como con mi Caso del Noveno Circuito. Mi abogado presentó una apelación de fianza por mí el 14 de mayo de 2021.

28. El 18 de febrero de 2021, mi abogada, la Sra. Mérida, de Al Otro Lado envió otra solicitud de libertad condicional a mi oficial de deportación de ICE. En la tarde del 4 de marzo de 2021, un oficial de ICE llamó a la Sra. Mérida y le dijo que me estaban negando mi solicitud de libertad condicional porque estaba sujeto a detención obligatoria. El oficial desestimó los argumentos de mi abogado y ni siquiera nos proporcionó a ella ni a mí una copia física de su decisión de denegación explicando su razonamiento.

29. El 13 de abril de 2021 volví a ser golpeado, esta vez por otro detenido de nombre Ávila. Intenté cubrirme pero Ávila seguía golpeándome. Los guardias lo rociaron con gas pimienta pero como yo estaba cerca el rocío también me afectó. Me llevaron a la oficina médica para lavarme los químicos después de este asalto. Se presentó un informe de la agresión, pero aún no he oído hablar del resultado.

30. Aunque yo era la víctima, me pusieron en segregación y no me dejaron salir hasta el 23 de abril de 2021. Solo estuve libre unos días porque el 29 de abril de 2021 me pusieron de nuevo en confinamiento solitario. Me dijeron que me pondrían en confinamiento solitario por mi propia seguridad.

31. Cuando me escoltaron fuera de la cápsula, me sujetaron por la muñeca y los tobillos mientras me filmaban. Me trataron como si me estuvieran disciplinando a pesar de que fui víctima de todas las agresiones que enfrenté mientras estaba detenida. Me sentí humillado por los oficiales.

32. Me colocaron en un baño durante aproximadamente una hora. Sin saber lo que estaba pasando, comencé a golpear las paredes para llamar la atención de un oficial. Después de esto vino un oficial y me dijo que iba a la oficina médica. Cuando me llevaron a la oficina médica, hablé con un psiquiatra. El psiquiatra me preguntó si tenía pensamientos suicidas. Le dije al psiquiatra que no. Un oficial estaba interpretando esto. Pregunté si me iban a llevar a observación. Los oficiales que estaban allí dijeron algo en inglés. Esto no es normal cuando alguien va a la

oficina médica, se supone que allí hay otra persona interpretando para el paciente, no un oficial. Los oficiales entonces me agarraron y me pusieron en observación.

33. En observación fui arrojado al suelo y despojado de mi ropa. Me dieron una bata verde. Pasé una noche en esta habitación y al día siguiente me devolvieron al aislamiento y estuve allí hasta el 8 de junio de 2021.

34. Mi tiempo en solitario ha sido extremadamente difícil para mí. En esa ocasión pasé allí un total de un mes y ocho días sin culpa mía.

35. Mientras estuve en solitario estuve severamente deprimido. Lloraba de la tristeza que sentía al estar allí. A veces me acurrucaba como una bola en la esquina de la habitación. Incluso golpeé mi cabeza contra el vidrio de la puerta solo para llamar su atención.

36. Llegó al punto en que tuve pensamientos de lastimarme a mí mismo. No dije nada porque me iban a mandar de nuevo a la habitación con la bata verde.

37. Me sentí muy aislado. Tenía poco o ningún contacto con nadie. Yo estaba en una celda de un solo hombre. Siempre estuve solo. Se suponía que tenía 2 horas de tiempo en el jardín, pero nunca era el tiempo completo porque tenía que compartir el tiempo con los demás que estaban en segregación. Me ofrecían tiempo en el jardín alrededor de las 6 o 7 de la mañana durante el momento más frío.

38. Cuando salía al patio, estaba en una jaula. Cuando se me permitía ver la televisión en la sala de recreo, también estaba en una jaula.

39. Estar en aislamiento también exacerbó mis problemas médicos, como mis problemas respiratorios y mi salud mental. Tengo problemas pulmonares debido a que fumaba cigarrillos en el pasado y mi trabajo mientras era DJ porque siempre había humo en la audiencia. En El Salvador me dijo un médico que tenía que tomar medicamentos para eso. Mientras estuve en El Salvador tomé medicamentos para eso, pero desde que me detuvieron no he tenido acceso a esos medicamentos. No he tenido acceso a esos medicamentos. Me hicieron una radiografía, pero el personal médico del centro me dijo que estoy bien, lo cual sé que no es el caso. Me preocupa cuál podría ser mi verdadera afección pulmonar. Mientras estaba en aislamiento, a menudo sentía que me costaba más respirar.

40. El 11 de mayo de 2021, mi abogado presentó otra solicitud de libertad condicional ante mi oficial de deportación y la oficina de ICE de San Diego. Días después recibí un documento de ICE que decía que negaban mi solicitud de libertad condicional.

41. Continué en la unidad de vivienda solitaria ("SHU"). Un oficial incluso me dijo que permanecería en la SHU hasta que mi caso terminara. Supliqué que me dejaran salir del aislamiento. Tenía miedo porque no creía que pudiera sobrevivir estando en aislamiento un día más, así que decidí hacer una huelga de hambre.

42. Creo que fue solo porque me puse en huelga de hambre que me liberaron de la SHU.

43. El 29 de mayo de 2021 comencé a rechazar la comida. Eventualmente, también coloqué un papel en la puerta de mi celda declarando que estaba en huelga de hambre. El 6 de junio de 2021 vinieron los guardias y me quitaron mi comisario.

44. El 6 de junio, solicité hablar con el oficial a cargo. Estos son los supervisores de ICE y están por encima del departamento de quejas de ICE. Luego, alrededor del 7 de junio a las 7 a. m., el oficial Fuentes, un supervisor de ICE, vino a convencerme de que detuviera mi huelga de hambre. Me ofreció trabajar 1 hora al día para tener más acceso a la televisión. No estaba buscando favores, solo quería que me sacaran del aislamiento porque sentía que no sobreviviría más a la tortura mental. Me negué, así que continué con mi huelga de hambre.

45. El mismo día 7 de junio a las 8 am, vino el oficial Flores y trató de convencerme de comer. Me negué y me dijo que alguien vendría a hablar conmigo.

46. Más tarde vino una mujer, su apellido era algo así como Beckam. Dijo que era la jefa de inmigración. Llevaba una chaqueta que tenía las letras ERO, que es parte de ICE. Ella dijo que no quería saber sobre las otras cosas. Me preguntó qué haría falta para que comiera. Le dije que no quería estar aquí. a lo que me preguntó a qué me refería con la unidad, establecimiento, país. Le dije que me refería al área solitaria en la que estaba, que no tenía acceso a nada que significara tiempo en el jardín, tiempo recreativo, uso del teléfono para poder hablar con mi abogado. Ella se fue y yo me quedé en la jaula.

47. Entonces vino el Oficial Flores con el Jefe de Seguridad Mora y me dijeron que querían hacer un trato conmigo. Me ofrecieron ubicarme en el módulo M pero no pude ir por la política allí, siendo estas las reglas que imponen las pandillas en el módulo, incluidos los impuestos en forma de sopas y la violencia que ocurre en el módulo que es un mucho porque hay peleas regularmente en esa vaina. Ya me habían golpeado antes y tenía miedo de que volviera a pasar si iba allí. Me ofrecieron más horas de recreo pero me negué, porque eso significaba que todavía estaría solo en solitario durante el resto del día. Yo no estaba bien y ellos lo sabían porque yo se los decía. Intentaron sobornarme con comida de afuera, pero me negué porque les dije que no me comprarían. Finalmente, me dijeron que si comía, podría haber un 95 por ciento de posibilidades de que pudieran volver a ponerme en mi antigua cápsula. Solo queriendo salir del aislamiento, acepté y me comí un sándwich de mantequilla de maní y mermelada. Luego dijeron que volverían mañana y cuando lo hicieron me indicaron que bajara la cabeza y dijera que seguiría el programa, es decir, continuaría con mi caso sin ningún problema, pero les dije por qué debería bajar la cabeza. si no hubiera hecho nada malo. Les dije que solo quería hacer mi programa. Al día siguiente, el 8 de junio de 2021, finalmente me devolvieron a la población general en la misma cápsula con las personas que me habían atacado anteriormente.

48. No me mantuve a salvo porque el 14 de junio de 2021 fui nuevamente asaltado por Chavarria. Estaba jugando al dominó en una mesa y Chavarría se me acercó con el palo de una escoba. Otro detenido trató de quitarle el palo a Chavarria para defenderme, pero no pudo por lo que lo golpearon fuertemente con el palo. Traté de defenderme y luego otro detenido de nombre Pérez trató de golpearme. Corrí a una celda y traté de cerrar la puerta, pero no cerraba del todo. Entonces, traté de sostener la puerta y ese mismo detenido junto con otro que se llama Stanley abrieron la puerta y me jalaron del cabello y luego comenzaron a golpearme en la cabeza. Los guardias llegaron y lanzaron gases lacrimógenos. Los dos detenidos que me golpearon mintieron y dijeron que yo era el agresor y me mandaron a la celda de aislamiento. También me quitaron el teléfono, el economato y el tiempo recreativo. Me siento desesperado y quiero rendirme, pero no puedo rendirme.

49. He pensado en iniciar nuevamente una huelga de hambre, pero temo que solo me lleve a ser trasladado o aislado nuevamente.

50. El 19 de julio de 2022 me pusieron nuevamente en régimen de aislamiento. Estaba tratando de contactar a alguien en El Salvador en las tabletas en el centro de detención. Mientras escribía la dirección de correo electrónico, la tableta se rellenó automáticamente e ingresó la dirección de correo electrónico con el apellido "Gallina", pero estaba tratando de escribir un apellido diferente que también comenzaba con una "G". La dirección de correo electrónico que se completó

automáticamente pertenecía a un oficial en Otay Mesa. No era mi intención enviar el correo electrónico al oficial, pero aun así me pusieron en confinamiento solitario por este inocente error.

51. Inicié una segunda huelga de hambre mientras estaba en régimen de aislamiento, del 19 al 28 de julio. El 28 de julio fui al médico y rompí mi huelga de hambre por mis malas condiciones de salud. El 29 de julio me devolvieron al aislamiento. El 5 de agosto tenía cita con el médico porque no me encontraba bien. El 6 de agosto me hice la prueba de COVID-19 y di positivo. Me llevaron de vuelta al solitario para terminar mi castigo y estar en cuarentena.

52. Mi confinamiento solitario finalmente terminó el 19 de agosto y me llevaron de regreso a E pod. En ese momento, todos en E pod estaban en cuarentena. Me dijeron que era inmune a COVID-19 durante 90 días porque acababa de tener COVID-19 y me pusieron en cuarentena entre todos los demás en E pod durante seis meses.

53. Durante mi tiempo en solitario, constantemente tenía dolores de cabeza. He tenido alrededor de 2-3 a la semana. Presionaba el botón de pánico y me hablaban en inglés y les contaba mis problemas y me decían que me apuntara a los médicos.

54. A veces tengo problemas para respirar. Mis problemas respiratorios también provienen de otra afección que tengo en la garganta. Estoy constantemente

tosiendo y tosiendo. Todo lo que me dieron para esto es Tylenol y me dijeron que hiciera gárgaras con agua con sal.

55. Es muy difícil conseguir una buena atención médica. Si necesita ver a un médico por la noche, solo se le dice que espere y se registre para una visita por la mañana. Cuando veo al médico, tengo que hacer una cita el mismo día alrededor de las 6 de la mañana. Luego lo llaman a lo largo del día para ver a una enfermera, no a un médico, y generalmente solo le dan acetaminofeno/Tylenol. Les digo que quiero ver a un médico, pero usted tiene que estar prácticamente muriendo por ver a un médico para hacer una cita para usted. Incluso cuando vas, no te escuchan.

56. En marzo de 2020, un trabajador social con licencia me diagnosticó algo llamado trastorno de adaptación con ansiedad mixta y estado de ánimo deprimido. Me deprimo y me pongo ansioso y sé que mi salud mental solo ha seguido empeorando.

57. El 28 de octubre de 2020 tuve un estudio en Alvarado Medical Center en San Diego. Un médico me dijo que podría tener un tumor o un coágulo de sangre. Esto me preocupó y seguí preguntando al respecto, pero no obtuve respuestas. No volví a ver a un urólogo hasta abril de 2021.

58. El 26 de abril de 2021 me llevaron a un hospital en San Diego y me dieron algunos antibióticos. Tuve que ser visto por un urólogo debido a una lesión en mis testículos que recibí de la golpiza durante mi tiempo en el Centro de Detención

Regional de San Luis. Sigo experimentando dolor testicular y temo por mi salud. Creo que el personal médico aquí no trata a las personas ni las escucha porque he experimentado esto y he visto que otros tampoco son escuchados.

59. Me siento mal y sigo sintiéndome peor cada día. Me cobran por cada solicitud médica que hago, pero a pesar de esos cargos, sigo enviando solicitudes con frecuencia. En diciembre de 2022 comencé a tener terribles migrañas. Estas migrañas han sido persistentes y todavía ocurren. Creo que están ocurriendo debido a mi tos excesiva causada por mi inflamación por reflujo ácido. Tomo unas cinco pastillas de Tylenol todas las noches para las migrañas.

60. El 15 de marzo de 2023 estaba tosiendo sangre y tenía fiebre. Muchas personas en mi grupo estuvieron extremadamente enfermas durante esa semana. El 16 de marzo, estaba esperando en una sala de visitas legales a que la oficina de mi abogado me dejara un documento. Empecé a sentirme extremadamente mareado y sentí que me iba a desmayar. Pedí ir al médico. Los guardias me llevaron al médico, pero ni la enfermera ni el médico me vieron. Me acaban de enviar de vuelta a mi cápsula. Seguí solicitando ver a un médico, pero siempre me lo negaron. Eventualmente le dije a un guardia que si no podía ver a un médico o llamar a una autoridad superior, me tiraría al suelo y tendrían que llamar "Hombre caído". Me mandaron al médico después de eso. La enfermera solo me dijo que no me veía bien y me dio Tylenol. Después de eso, hice una queja médica.

61. También me dijeron que no podría ver a una enfermera ni a un médico porque tengo una próxima cita en el hospital, pero no me dirán cuándo es mi cita en el hospital debido a "preocupaciones de seguridad". No solo se me niega el acceso al médico, sino que se me niega información sobre supuestas citas que me hacen.

62. No puedo comer aquí porque la comida me produce un reflujo ácido importante y me causa dolor. He perdido una tonelada de peso porque no puedo comer. Nunca desayuno y a menudo me salto otras comidas. Una vez que le mencioné mi dolor de estómago al médico, me dijo que podía intentar una "dieta líquida". Al día siguiente le dije que quería probar la dieta líquida y me dijo con severidad que no habría dieta líquida para mí y que no volviera a preguntar. También traté de obtener comidas kosher aquí en Otay Mesa para ver si ayudaría, pero me negaron y me dijeron que completara una gran cantidad de documentación.

63. Estoy mentalmente mal. Quiero recibir ayuda de salud mental y poder hablar con un psicólogo, pero tengo miedo del psicólogo aquí en Otay. Tiene muchas quejas en su contra. Una vez que me vio llorando, en lugar de ayudarme o hablarme, me puso en una habitación aislada bajo vigilancia suicida.

64. Constantemente tengo pesadillas en las que me disparan. La sensación de recibir un disparo en mi sueño me despierta sintiéndome aterrorizada. No puedo compartir este tema con el personal médico de Otay Mesa porque tengo miedo de volver a aislarme.

65. Mientras estuve en OMDC, estuve en cápsulas donde estuve expuesto a Covid. Esto sucedió mientras estaba en la cápsula M donde alguien murió debido al virus. Recientemente, muchas personas han tenido síntomas de resfriado y no se han sentido bien. Conozco personas con tos prolongada, secreción nasal, partes íntimas inflamadas y otros problemas médicos. Sin embargo, las personas dudan en informar estos problemas médicos porque temen estar en cuarentena. Una vez tuvimos una cuarentena de seis meses.

66. Nuestras viviendas están superpobladas. Una vez, el gerente de Otay Mesa me dijo que nuestra área de cápsulas solo puede acomodar a 20 personas. Actualmente hay alrededor de 59 personas en nuestro pod.

67. Durante mi largo tiempo en OMDC, he presentado varias quejas sobre los centros de detención y lo que me ha sucedido. He hecho denuncias policiales por los delitos cometidos en mi contra. Creo que me han tratado injustamente e incluso me han puesto en aislamiento como represalia porque hablo. Por ejemplo, el 5 de mayo de 2021, un oficial me dijo que permanecería en régimen de aislamiento hasta que mi caso terminara. El mes pasado también me dijeron que me transferirían a otra instalación llamada GEO en el centro de San Diego. Luego me dijeron que podría ser transferido a una instalación diferente. No sé por qué me siguen diciendo estas cosas. No creo que esto sea correcto. Siento que me están castigando por pelear mi caso.

68. Ahora he estado detenido bajo la custodia de ICE por más de 40 meses. He sido agredido y tratado como menos que humano mientras estaba detenido. Mi salud mental solo ha empeorado y tengo miedo de seguir detenida. Ya me han golpeado 5 veces y ICE no me ha protegido, sino que me ha castigado poniéndome en aislamiento. Incluso he presentado informes policiales, pero estoy empezando a pensar que realmente no investigan porque soy un inmigrante detenido para ellos.

69. He estado en huelga de hambre desde el 22 de junio de 2023, como respuesta a haber sido segregado injustamente. He tenido problemas para buscar acceso a los medicamentos que necesito para mi condición médica y la ACLU me está ayudando con una queja sobre esto que creo que sigue pendiente.

70. Solo pido una oportunidad para continuar peleando mi caso en un ambiente seguro. Siento que no puedo participar en mi caso mientras estoy detenido. Cuando le pregunto a un oficial sobre mi caso, me niega cualquier información o me dice que me van a deportar. Nunca sé sobre mi caso a menos que hable con mis abogados y me cuesta dinero hacer esas llamadas. No tengo acceso a muchos recursos y mi salud está empeorando. Los centros de detención no son entornos seguros.

71. Si me liberaran, viviría en Park Ridge, Illinois con mis patrocinadores Beth Hillman y Juan Villalobos, ambos ciudadanos estadounidenses. Mis patrocinadores han accedido a dejarme vivir con ellos si me liberan. Declaro bajo pena de perjurio

que lo anterior es verdadero y correcto. Ejecutado el 23 de junio de 2023 en San

Diego, California.

**HEVER ALBERTO MENDOZA LINARES**
Declarant

CERTIFICATE OF TRANSLATION

I, Yvette Aguayo, am competent to translate from the Spanish Language to English and certify

that the translation of the documents is true and accurate to the best of my abilities.

Signature of translator                                  06/23/2023
                                                         Date

Yvette Aguayo
Printed name of translator

Address: 634 S Spring St, Suite 908, Los Angeles, CA 90014

Phone Number: (619) 983-5275

# EXHIBIT B

*Office of Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
Otay Mesa Detention Center
7488 Calzada De La Fuente
San Diego, CA 92154



**U.S. Immigration
and Customs
Enforcement**
June 8, 2020

Priscilla Merida
Al Otro Lado
511 San Ysidro, Suite 333
San Ysidro, CA 92173

Reference:  Mendoza-Linares, Hever Alberto A213 209 821 (El Salvador)

Dear Ms. Merida,

This letter is in reference to the Application for Release on Parole, which you filed for your client.  You have requested that ICE use discretion to have your client released.

After careful consideration of all of the factors addressed in your request for Application for Release on Parole and a careful review of your client's administrative file, it has been determined that the granting of such discretionary release is not warranted in this case, as the granting of such discretionary release would not conform to this agency's priority.  On May 27, 2020, the Immigration Judge did not find credible fear and returned the case to the Department of Homeland Security for removal to El Salvador with no appeal available.  Therefore, your application for discretionary release is denied. There is no appeal from this decision.

Sincerely,

*Mario G. Ortiz*

Mario G. Ortiz
Assistant Field Office Director

47

# EXHIBIT C



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OTAY MESA IMMIGRATION COURT**

Respondent Name:

MENDOZA-LINARES, HEVER ALBERTO

To:

Enriquez, Ralph Ayala
4575 Mission Gorge Place, Suite B
San Diego, CA 92120

Alien Registration Number:

213209821

Riders:

In Custody Redetermination Proceedings

Date:

01/15/2021

### ORDER OF THE IMMIGRATION JUDGE

The respondent requested a custody redetermination pursuant to 8 C.F.R. § 1236.  After full consideration of the evidence presented, the respondent's request for a change in custody status is hereby ordered:

☒ Denied, because

No jurisdiction.

☐ Granted. It is ordered that Respondent be:

☐ released from custody on his own recognizance.

☐ released from custody under bond of $

☐ other:

☐ Other:

Immigration Judge: Grande, Guy  01/15/2021

Appeal:   Department of Homeland Security:   ☒ waived   ☐ reserved
          Respondent:                        ☐ waived   ☒ reserved

Appeal Due: 02/16/2021

# EXHIBIT D



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**OTAY MESA IMMIGRATION COURT**

| | |
|---|---|
| Respondent Name: | Alien Registration Number: |
| MENDOZA-LINARES, HEVER ALBERTO | 213209821 |
| To: | Riders: |
| Merida, Priscilla | In Custody Redetermination Proceedings |
| 511 E. San Ysidro Blvd. | |
| Suite 333 | Date: |
| San Ysidro, CA 92173 | 03/01/2021 |

### ORDER OF THE IMMIGRATION JUDGE

☒ Respondent  ☐ the Department of Homeland Security has filed a motion to reconsider.

Upon consideration of the motion, and any opposition from the non-moving party, the motion is ☐ granted ☒ denied for the following reason(s):

☐ The motion is numerically barred. *See* INA § 240(c)(6)(A); 8 C.F.R. § 1003.23(b)(1).

☐ The motion is untimely. *See* INA § 240(c)(6)(B); 8 C.F.R. § 1003.23(b)(1).

☒ The motion does not specify errors of law or fact in the previous order or is not supported by pertinent authority. *See* INA § 240(c)(6)(C); 8 C.F.R. § 1003.23(b)(2).

☒ Other:

For the reasons stated in the response filed by the Department of Homeland Security.

Immigration Judge: Grande, Guy  03/01/2021

Appeal:  Department of Homeland Security:  ☐ waived  ☐ reserved
Respondent:  ☐ waived  ☐ reserved

Appeal Due:

**Certificate of Service**

This document was served:

Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service

To: [  ] Alien | [  ] Alien c/o custodial officer | [ E ] Alien's atty/rep. | [ E ] DHS

By:  Gahan, Jason , Court Staff

Date:  03/02/2021

# EXHIBIT E

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
880 Front Street, Suite 3200
San Diego, CA 92101



**U.S. Immigration
and Customs
Enforcement**

MAY 1 4 2021

In Reference:  MENDOZA-Linares, Hever Alberto A213 209 821

## NOTIFICATION DECLINING TO GRANT PAROLE

The purpose of this letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to grant you parole from detention at this time.  Under ICE policy, arriving aliens determined by an Asylum Officer to have a credible fear of persecution or torture are initially considered for parole.  While the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community.

As part of its determination whether to parole you, your immigration files and any supplemental documentation that you provided were reviewed at that time.  After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

☐ You have not established your identity to the satisfaction of ICE.
    ☐ You did not present valid, government-issued documentation of identity, or any documents you submitted did not, to ICE's satisfaction, establish your identity.
    ☐ You did not provide third-party verification of your identity, or any third-party information you provided did not, to ICE's satisfaction, establish your identity.
    ☐ You did not, to ICE's satisfaction; establish your identity through credible statements.

☒ You have not established to ICE's satisfaction that you are not a flight risk.
    ☐ You failed to provide, to ICE's satisfaction, a valid U.S. address where you will reside while your immigration case is pending.
    ☐ You did not establish, to ICE's satisfaction, substantial ties to the community.
    ☒ Imposition of a bond or other conditions of parole would not ensure, to ICE's satisfaction, your appearance at required immigration hearings pending the outcome of your case.

☐ You have not established to ICE's satisfaction that you are not a danger to the community or U.S. security.  In making this determination, ICE has considered any evidence of past criminal activity, activity contrary to U.S. national security interests, activity giving rise to concerns of public safety or danger to the community, disciplinary infractions or incidents, or

other criminal or detention history that shows you have harmed or would likely harm yourself or others.

☐ Additional exceptional, overriding factors (e.g., law enforcement interests or potential foreign policy consequences) in your case militate against parole, as follows:

_____
_____
_____
_____

☐ ICE previously provided you with a written decision declining to grant parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

You may request a redetermination of this decision in writing, based upon changed circumstances in your case or additional documentation you would like ICE to consider. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. For example, if you have not established your identity to ICE's satisfaction, you may wish to consider providing previously unfurnished government-issued documents such as passports, birth certificates, or identity cards. Identity can also be established through written statements prepared by individuals whom you know in the United States and whose identity ICE can verify to its satisfaction. These statements should include the address of the person you know in the United States and evidence of his or her identity. Finally, if there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request redetermination of this decision, please direct your written request to the address above, include a copy of this letter and any other prior ICE written decision(s) declining to grant you parole, and clearly explain what changed circumstances or additional documents you would like considered. Failure to provide satisfactory documentation and explanation may result in a denial of your request for redetermination.

Sincerely,

Janina S. Estudillo
Assistant Field Office Director